COMMONWEALTH *vs.* DARREN M. LINDSEY.

No. 98-P-1820.

Berkshire. November 15, 1999. - February 24, 2000.

Present: PORADA, KAPLAN, & GILLERMAN, JJ.

*Joint Enterprise. Practice, Criminal,* Agreement between prosecutor and witness, Argument by prosecutor.

At the trial of an indictment in which the main witnesses against the defendant were a codefendant and a police informer, both of whom had untried charges pending against them, the prosecutor's improper vouching for the witnesses without a required cautionary instruction in accordance with *Commonwealth* v. *Meuse,* 423 Mass. 831, 832 (1996), his repeated improper references to the subculture of drug dealers, and his inflammatory remarks about Central American countries and police officers risking their lives created a substantial risk of a miscarriage of justice, considering the weakness of the case against the defendant; a new trial was required. [644-646]

INDICTMENT found and returned in the Superior Court Department on December 19, 1996.

The case was tried before *Constance M. Sweeney,* J.

The case was submitted on briefs.

*Peter M. Dempsey* for the defendant.

*Jennifer Tyne,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A grand jury in Berkshire County indicted the defendant Darren Lindsey for distributing cocaine, and for distributing the same within a thousand feet of a school zone, both offenses having occurred on October 28, 1996; and for trafficking in cocaine of a net weight of more than fourteen but less than twenty-eight grams on November 23, 1996.

A jury in Superior Court acquitted the defendant of the two charges of October 28, but convicted him of the charge of November 23.

It will be convenient to deal with the happenings on the two dates. Principal witnesses for the Commonwealth were, respectively, Mark Mazzer and James Little. They had drug charges outstanding against them and each was willing to cooperate on the understanding that he might be given consideration for his help when the time came to dispose of the pending case or cases. In presenting these witnesses to the jury and in other behavior the prosecutor created a background that puts a question about the fairness of the trial as affecting the conviction.

1. *October 28 transaction.* Mark Mazzer, who had previous criminal involvement with cocaine distribution in North Adams, offered to solicit a purchase from Ron Montgomery, from whom he had earlier bought small quantities of cocaine. Mazzer reached Montgomery and arranged to meet him at the Champion outlet store on West Housatonic Street in Pittsfield on the evening of October 28, 1996. Under the usual protocol for a police "controlled buy," Mazzer, personally "clean" and driving a "clean" Honda, went alone to the appointed place. Montgomery, driving a Chevy Blazer with tinted side windows, drew alongside, with the Blazer passenger's side adjacent to the Honda driver's side. After some haggling a price of $120 was set and Montgomery handed to his passenger a bag of crack cocaine (2.81 grams on later weighing), which the passenger handed through the window to Mazzer's outstretched hand. Mazzer said he observed during the transaction through his open driver's window a man in the rear of the Blazer, silent, leaning forward with his hands outstretched on the front seat backs. This is taken to have been the defendant Lindsey. The front passenger in the Blazer was later known to be James Little. Pittsfield police watched the "buy" closely and followed the Blazer as it went to a Friendly's restaurant parking lot. The car had run a red light on the way. As police approached, Montgomery got out of the car. He then volunteered (falsely) to the police that the defendant was the driver who ran the light and the police chose to ticket the defendant for the traffic offense.[1]

2. *November 23 transaction.* Little was on probation in North Carolina when he appeared in Pittsfield, and when he gave testimony in the present case, stood charged on account of the October 28 episode, the November 23 episode (now to be

---

[1]The testimony concerning the October 28 episode came from Mazzer and police officers.

recounted), and a fresh drug offense committed after November 23. Montgomery drove up to Pittsfield from North Carolina with his brother and the defendant and Little. The latter two knew Montgomery's reputation back in that State as a drug seller. Montgomery, the defendant, and Little put up at the Colonial Hotel in Pittsfield; Montgomery paid for a hotel room which was shared by the defendant and Little. Shortly, as a result of a difference with the management of the hotel, the three took separate rooms at the nearby Huntsman's Motel. Around this time, Little said, a drug pattern emerged, with Montgomery securing cocaine from the outside and furnishing it to the other two who (perhaps with Montgomery himself) sold it in small bags on John Street in Pittsfield to any who came by and inquired. Little said he saw the defendant engaged in such hand to hand sales on the street.

The morning of November 22, 1996, Montgomery left some cocaine with Little in Little's room, no. 8. Around 10:00 P.M., Montgomery telephoned to ask Little to wait until he came back, presumably from a trip to New York. About this time the police observed Montgomery driving off from the motel. The defendant appeared in no. 8 with women companions; after a while, the women departed, the defendant remained, and Little started to play a video game. At 1:00 A.M., November 23, Montgomery telephoned to say he had returned and was on his way. There came a knock, Montgomery appeared, threw some cocaine on the bed, and said he wanted Little (or "us"?)[2] to hold the drugs. Little testified that the defendant, who was on the couch, moved the stuff to a desk. Shortly the police knocked and proceeded to execute a search warrant, yielding a total of 18.69 grams of crack cocaine from three locations in the room; beepers, a cell phone, and baggies were also found. As the police entered, Little tried futilely to escape the room and then gave the false name Kevin Walker. The defendant made no move; he invited the police to search his room, no. 7, which they did, but found nothing.[3]

3. *Proof respecting defendant.* During pretrial proceedings, the defendant objected to the proposed trial of the October 28

---

[2]In a statement to the police and in grand jury testimony Little spoke in the sense that Montgomery was entrusting the cocaine to him, Little; at trial it was "us."

[3]The testimony involving the defendant came mostly from Little; police officers testified to their actions.

charges together with the November 23 charge; he insisted that the events were distinct and should be separately tried. After rather confused argument by the prosecution in terms of "conspiracy," it seemed accepted that the prosecutor would be trying the case on a theory of joint venture with connection or continuity among all the charges. The judge's instructions spoke to joint venture.

When the jury acquitted on the October 28 counts, the notion of joint venture was put in question.

The most plausible ground of the acquittal was that the defendant appeared from the evidence, taken full strength, to have been on the scene but not joining in the transaction — and the judge's instructions had distinguished in the accustomed way between presence and participation.

The case against the defendant for November 23 was improved, but, in our view, not by much. Little, in markedly and perhaps suspiciously neat testimony, has the defendant touching some cocaine as he moves it from the bed to the desk. There is the testimony about the defendant's selling the drugs on John Street, but this is hardly a clincher. It is Little's words which amount to a general accusation; the Commonwealth offered no proof of particular sales. The charge is trafficking on November 23, and any tie back of the supposed sales to the corpus delicti of the indictment, the quantity seized at Little's room no. 8, is quite weak.

4. *Prejudicial factors.* If, under the rule of the *Latimore* case, *Commonwealth* v. *Latimore*, 378 Mass. 671 (1979), a required finding in the November 23 charge could be averted, it was by a small margin. We need to consider the weakness of the material case against the defendant, and the dependence of that case on the veracity of the witness Little, when it comes to evaluating the conduct of the prosecutor in its possible or likely influence on the jury.

The prosecutor, opening to the jury, said he was going to call two witnesses with drug charges lodged untried against them, "who are willing to testify honestly and truthfully in exchange for what they hope to be consideration offered by the Commonwealth," that is, a recommendation of some kind of leniency when the witnesses ultimately pleaded guilty to the charges against them.

All would agree that care and caution are needed in dealing with testimony that is offered by a witness to implicate another

in a crime, when the testimony is the price the witness has undertaken to pay in a plea bargain with the prosecutor. Caution ought to be increased, not diminished, where such testimony is presented to the triers as "true." Juries are apt to assume that a bargain for honest and truthful testimony implies that the prosecutor has means of verifying the witness's testimony and stands back of it when it is tendered at trial.[4] Accordingly, in fairness to the accused, the bargained testimony may be received only if the jury's likely assumption is plainly and forcefully negated. All this is elaborated in the leading case of *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989), and the matter is summarized thus in *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996): "When a prosecution witness testifies pursuant to a plea agreement containing a promise to tell the truth, and the jury are aware of the promise, the judge should warn the jury that the government does not know whether the witness is telling the truth. [Citing *Ciampa*, 406 Mass. at 264]. Although a failure to instruct, standing alone, would not be reversible error (cf. *Commonwealth* v. *Grenier*, 415 Mass. 680, 687 [1993]), if the prosecutor has vouched for that witness's credibility, such a failure to instruct is reversible error."

Here there was no such instruction, and, beyond the prosecutor's "vouching" that was implicit in the very nature of the bargain, he edged up to explicit vouching when he said in his closing speech to the jury that "we have no interest in punishing an innocent person" and "[i]f you are looking for the truth and you find the truth in this matter, the Commonwealth is satisfied that you'll find the defendant guilty." This suggested that the prosecutor knew the truth and a verdict of guilty would correspond with and vindicate this truth. See *Commonwealth* v. *Meuse*, 38 Mass. App. Ct. 772, 776 (1995), *S.C.*, 423 Mass. 831 (1996). There is argument, further, that when the prosecutor referred rather casually to some supposed facts that were not in

---

[4]Where, as here, the reward for "truthful" testimony is left indefinite, a jury, assuming the prosecutor knows the truth, may conceive that he has cleverly left himself in a position to accommodate the reward to the extent the witness testifies to the mark: thus, the jury may reason, there is enhanced pressure on the witness to tell the exact truth and the testimony given should be accorded high value. The prophylaxis needed (as indicated below) is to explode the idea that the prosecutor knows or can ascertain the truth.

evidence, he was intimating that he had special knowledge and access to the "truth."[5]

The prosecutor corrupted the atmosphere of the trial by referring repeatedly to the "culture" or "subculture" of drug dealers inhabited, as the prosecutor would have it, by this defendant. In the same line, he said he made no apologies for contracting with types like Mazzer and Little for their testimony because, "As I said in my opening, when you're in the gutter, you don't find swans," and it was by such degraded alliances that one targeted the higher-ups in the drug chain. Finally came an inflammatory burst as follows: "Unless we buy the countries of Colombia and Bolivia and other Central American countries and burn them to the ground, drugs are going to keep coming into this country. And as long as they remain illegal, police officers will risk their lives to fight the war on drugs." See *Commonwealth* v. *Gallego*, 27 Mass. App. Ct. 714, 718-719 (1989).

The Commonwealth would ask us to palliate the prosecutor's blunders. As to the prosecutor's uncorrected indication that Little would give honest and truthful testimony, the Commonwealth may say the prosecutor did not give that statement emphasis through repetition, and the jury were told in general terms about the need for assessing witnesses' credibility in light of their motives and interests. Despite the fault of promising truthful testimony and the further fault of uttering overheated and misdirected appeals to convict, the jury did retain enough composure to discriminate among the charges and to acquit on two of them. And as the defendant's trial counsel was inert and did not register objections, our standard of review is the more indulgent one of *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967): "The test is whether there is a substantial risk of a miscarriage of justice."[6]

The case is not crystal clear, but on the whole we think the judgment should be reversed for a new trial.

*Judgment reversed.*

*Verdict set aside.*

[5]So the defendant points to the prosecutor's remarks that the defendant was unemployed while in North Carolina and was selling drugs because he needed money, and that Montgomery paid the bill for the defendant's room in the Huntsman's Motel.

[6]For recent consideration of this concept, see *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999).