## Commonwealth *vs.* Jose Rosario.

Hampden. March 11, 2011. - July 19, 2011.

Present: Ireland, C.J., Spina, Cordy, & Duffly, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Instructions to jury, Agreement between prosecutor and witness, Jury and jurors. *Intent. Evidence,* Intent, Relevancy and materiality. *Jury and Jurors.*

At a murder trial, the judge correctly instructed the jury that only an intent to cause the victim's death supported a verdict of murder in the first degree, and the judge's further instruction, given in connection with her discussion of murder in the first degree, that an inference of malice could be drawn from the intentional use of a dangerous weapon on another person, did not create a substantial likelihood of a miscarriage of justice. [186-188]

At a murder trial, any prejudice to the defendant arising from one witness's reference to his cooperation agreement's requirement of truthful testimony was cured by the judge's instructions at the time of the reference and in final instructions [188-189]; further, the prosecutor's elicitation from a second witness, on redirect examination, of the requirement of truthful testimony in that witness's cooperation agreement was not error, and the prosecutor's closing argument on this point did not amount to improper vouching [190-191].

The judge at a murder trial did not abuse her discretion by admitting, over objection, testimony from a witness on redirect examination that he believed he would be beaten or killed by gang members for testifying, where evidence that the defendant was a member of that gang was relevant to the Commonwealth's theory of the case, where the witness's testimony was relevant to rehabilitate him after his motives for testifying had been impeached, and where any potential prejudice to the defendant was mitigated by the judge's individual questioning of prospective jurors during voir dire regarding gang-related evidence and by her final instruction to the jury that evidence of gang association could only be considered with respect to motive and not propensity to commit the crime charged. [191-193]

At a murder trial, the judge did not abuse her discretion in declining to discharge a juror who reported being followed by a member of the defendant's family, where the judge questioned the juror who reported the incident and conducted an individual voir dire to determine whether any other juror had heard about incident and, if so, whether he or she could remain impartial. [194-195]

A Superior Court judge did not abuse her discretion in denying the criminal defendant's motion for a new trial, where a letter and testimony from a third party stating that a witness had lied at trial did not cast doubt on the defendant's convictions, given that the letter and testimony, even if true,

were cumulative of other impeachment evidence that was available to the defendant at the time of trial; likewise, evidence of a witness's alleged cooperation agreement did not cast doubt on the convictions, where the defendant had the chance at trial to make the jury aware that the witness thought he was testifying pursuant to a cooperation agreement, but chose not to do so. [195-197]

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a conviction of murder in the first degree to a conviction of involuntary manslaughter, and found no substantial likelihood of a miscarriage of justice for any other reason not raised on appeal. [197-198]

INDICTMENTS found and returned in the Superior Court Department on September 1, 1999.

The cases were tried before *Tina S. Page*, J., and a motion for a new trial, filed on October 22, 2001, was heard by her.

*Joseph A. Hanofee* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of June 4, 1999, Mario Cordova was shot in front of 5 Lionel Benoit Road in Springfield. He died on June 9. Five men were indicted as joint venturers in the murder. Three of the codefendants — Alberto Montanez; Felix Padilla, Jr.; and Adrian Rivera — pleaded guilty to manslaughter. Montanez and Rivera entered into cooperation agreements with the Commonwealth and testified at the separate trials of Jason Rivas (alleged to have been the shooter) and the defendant, Jose Rosario. On May 26, 2000, a jury found Rivas guilty of murder in the first degree. In 2007, Rivas was granted a new trial and subsequently pleaded guilty to manslaughter.

On September 28, 2000, a jury found the defendant guilty of murder in the first degree, and he was sentenced to a life term in State prison.[1] He filed a notice of appeal on October 27, 2000. A motion for a new trial was filed in this court on October 22, 2001; we remanded it to the Superior Court, where it was

---

[1] The defendant was also convicted of unlawful possession of a firearm, G. L. c. 269, § 10 (*h*) (1); unlawful carrying of a firearm, G. L. c. 269, § 10 (*a*); and unlawful discharge of a firearm within 500 feet of a dwelling or other building, G. L. c. 269, § 12 (*e*). He was sentenced to concurrent terms of from four to five years on the possession of ammunition conviction; one year on the possession of a firearm conviction; and three months on the discharge of a firearm within 500 feet of a dwelling conviction.

entered on October 24, 2001. The trial judge held an evidentiary hearing in November, 2002, and denied the defendant's motion for a new trial on May 7, 2010.[2] His appeal from that denial has been consolidated with his direct appeal which is now before us.

On appeal, the defendant contends that the judge erred by (1) failing effectively to instruct the jury that only an intent to kill can support a conviction of premeditated murder in the first degree; (2) allowing the prosecutor to elicit testimony from cooperating witnesses, Rivera and Montanez, that they were testifying "truthfully" pursuant to their cooperation agreements; (3) allowing a cooperating witness, Rivera, to testify that members of the Latin Kings gang kill cooperating witnesses in prison; and (4) refusing to discharge a juror who reported being followed by a member of the defendant's family. He also contends that the judge abused her discretion when she denied his motion for a new trial where new evidence impeaching the credibility of Rivera was presented, and where evidence of the existence of an allegedly undisclosed cooperation agreement between the Commonwealth and another witness, Luis Rodriguez, was discovered. Finally, he asks us to exercise our authority under G. L. c. 278, § 33E, to reduce his murder conviction to involuntary manslaughter. For the reasons that follow, we affirm the convictions, decline to grant relief under G. L. c. 278, § 33E, and affirm the denial of the motion for a new trial.

1. *Evidence at trial.* There was evidence at trial to the following effect. The defendant was a "regional officer" of the Latin Kings street gang. Prior to the night of the shooting, he had had three encounters with the victim and his friend, Johnel Olmo, all stemming from the defendant's claim that they had stolen money or drugs from his apartment during a party. The first encounter occurred when the defendant pointed a shotgun at Olmo's head while the victim was present and said that "there

[2]The lengthy delay was largely the product of the defendant's successful motion to stay disposition of his motion for a new trial pending the completion of discovery and decision in codefendant Jason Rivas's motion for a new trial. On May 7, 2010, in addition to denying the defendant's motion for a new trial, the judge also denied his motion to set aside the jury verdict and enter a judgment on the lesser offense of manslaughter, which was filed on October 22, 2008.

was going to be trouble" and that they "should pay the money." The second encounter occurred at night when Olmo and the victim observed two automobiles (one belonging to the defendant), with their headlights off, pull into a driveway. Three or four people got out of the cars; one had a shotgun and another had a baseball bat. Olmo and the victim ran to Olmo's girl friend's house and telephoned the police. The defendant was gone by the time the police arrived. The third encounter occurred when the defendant approached Olmo while he and the victim were at a bar, asked for his money, and challenged Olmo to a fight.

On the evening of June 3, 1999, Jenette Vasquez was hosting Luis Rodriguez and several other friends for dinner and a movie in her first-floor apartment at 5 Lionel Benoit Road. Vasquez also had invited the victim and Olmo to the gathering. At some point before the victim and Olmo arrived, Vasquez's upstairs neighbor and the defendant (who was a friend of the neighbor) stopped by Vasquez's apartment. While the defendant was present, Vasquez made a telephone call to Olmo to find out when he would arrive. Olmo asked Vasquez to tell him who was present at the apartment; Olmo then asked to speak to the defendant. The defendant told Olmo, "I'm your worst nightmare." Shortly after that telephone call, the defendant and the neighbor left Vasquez's apartment. Olmo and the victim arrived a short time later to watch the movie.

Meanwhile, Montanez, Padilla, Rivas, and Rivera were together at Rivera's house. All four were members of the Latin Kings gang and subordinate in rank to the defendant.[3] Montanez testified that he could be subject to "a violation or a termination" if he did not comply with an order from a higher ranking member. Montanez and Rivera testified that the defendant called Padilla sometime before midnight, instructing Padilla to pick him up on Worthington Street in Springfield and bring the handgun that was kept in Rivera's home. When the call ended, Padilla told Rivas to look for the weapon upstairs. Rivas complied and returned with a black and brown gun and the four

---

[3]Alberto Montanez was a "first crown" and was senior in rank to Padilla, who was a "third crown." Neither Rivera nor Rivas had any rank in the gang.

men left Rivera's house in Padilla's automobile. Rivas handed the gun to Montanez.

Padilla picked up the defendant on Worthington Street. The defendant mentioned "a beef he had" with Olmo and the victim; Rivas said that he also had "a beef" with them. The defendant told Padilla to drive to 5 Lionel Benoit Road because "he had a problem with a kid and . . . thought that the kid was still there and . . . didn't want to go by himself." When they arrived, the defendant, Montanez and Rivas got out of the vehicle. The defendant instructed Montanez to give the gun to Rivas and told them both to wait "between some buildings," which they did. The defendant got back in the car and Padilla drove further down the street with the vehicle's headlights off.

The victim, Rodriguez, Olmo, and two other guests left Vasquez's apartment after the movie ended. Olmo, however, returned to Vasquez's apartment to use the bathroom. The victim and the others waited for Olmo near the entrance of the building; the victim opened the door and looked down the road.

Montanez testified that he and Rivas were standing between the buildings when he saw Padilla make a "U-turn" with his automobile on Lionel Benoit Road. The defendant got out of the vehicle, ran to them between the buildings, looked at the victim standing in the doorway, pointed, and said, "Go, go, go." The defendant touched Rivas on the back, and Rivas fired three shots at the victim from approximately twenty feet away. The first shot hit the victim in the head and he fell to the ground. The second shot hit a drain pipe nearby, and the path of the third shot was unknown.[4] The defendant, Montanez, and Rivas returned to Padilla's automobile, and the defendant ordered Padilla to drive away. Padilla drove off, and the defendant said, "He got one of them."

Vasquez telephoned 911. The victim was transported to Baystate Medical Center, where he died six days later from a gunshot wound to the head.

The next day at work, the defendant appeared tired and nervous and told a coworker, "I snuffed somebody." The defendant received a telephone call at work and was heard to say, "For

---

[4]The gun was never recovered.

real?" The defendant then told his coworker, "Well, you won't see me no more, Dog." At some point after the shooting, the defendant telephoned Olmo and told him, "Latin King love," and that he would "get [him] later."

On June 10, 1999, Rivera was escorted to the Springfield police station by two high ranking members of the Latin Kings — Ivan Serrano and Ivan Pena — and volunteered a written statement that Padilla shot the victim and that he acted alone. Padilla was in police custody at the time, and Rivera testified that he made the statement because Serrano told him Padilla was "snitching." Serrano told Rivera to "blame it on [Padilla] because he was blaming us." Rivera testified at trial that the statement he made to police at that time was a lie.

Montanez was arrested on June 18, 1999, on unrelated drug charges and subsequently made statements to police on August 25 and August 27, 1999, about the June 3 shooting. Montanez also testified that his first statement was not completely truthful. Both Rivera and Montanez asserted at the defendant's trial that, although they lied to police, their testimony as to the defendant's involvement in the murder was the truth.

2. *Jury instructions.* The judge instructed the jury that in order to convict the defendant of premeditated murder in the first degree, the Commonwealth must prove beyond a reasonable doubt that "the killing was committed with malice." She further instructed that malice "means an intent to cause death," and that the "Commonwealth must prove that the defendant actually intended to cause the death of the deceased." The defendant asserts that this instruction, although correct, "lost effect" when she immediately followed it with an instruction that "[a]s a general rule" the intentional use of a dangerous weapon on another permits an inference of malice, thereby, he argues, permitting the jury to infer first prong malice from the use of a handgun even if there was no specific intent to kill the victim.[5] Relatedly, the defendant contends that it was error for the judge not to provide a so-called *Jiles* instruction, emphasizing that only malice — that is, malice defined as a specific intent to kill

---

[5]The judge further instructed the jury "as a matter of law that a firearm or handgun is a dangerous weapon."

— can support a conviction of murder in the first degree. See *Commonwealth* v. *Jiles*, 428 Mass. 66, 71-72 (1998) (*Jiles*).

The Commonwealth argues, as a threshold matter, that the defendant did not preserve the error by objecting to the instruction after it was given. Even if preserved, the Commonwealth argues that there was no error in the jury instruction that prejudiced the defendant. We turn to whether a proper objection was made to the jury instruction and the appropriate standard of review to apply.

The defendant requested the *Jiles* instruction, and the judge indicated that she intended to give it and explain to the jury that only "first prong" malice, or an intent to kill, can support a conviction of deliberately premeditated murder. On the defendant's written request for the instruction on "first prong" malice, the judge wrote, "Allowed." During her instructions to the jury, the judge did not read the language of *Jiles* verbatim. The defendant did not object at that time.

We have held that requested jury instructions that are denied by the trial judge are preserved on appeal. See *Commonwealth* v. *Linton*, 456 Mass. 534, 552 n.13 (2010); *Commonwealth* v. *Biancardi*, 421 Mass. 251, 253-254 (1995). However, that is not the case here. The judge allowed the defendant's requested instruction. If the defendant was dissatisfied with the instruction on malice as given, he had an obligation to object at the end of the judge's instructions. See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979). The issue therefore was not preserved, and the instructions will be reviewed to determine whether an error occurred and, if so, whether that error created a substantial likelihood of a miscarriage of justice.

We note first that the use of the clarifying language suggested in *Jiles* is not mandatory. *Jiles*, *supra* at 72-73 (although "judge should more clearly have instructed the jury that any of the three prongs of malice could support a conviction of murder in the second degree but that only the first prong could support a conviction of murder in the first degree by reason of deliberate premeditation," there was no substantial likelihood of miscarriage of justice). Here, the judge clearly instructed the jury that only an intent to cause the victim's death supported murder in the first degree, and, in contrast, that malice for murder in

the second degree had three meanings: (1) an intent to cause death; (2) an intent to cause grievous bodily harm; and (3) an intent to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result. These instructions were correct as given. There was no error. The judge's further instruction, given in connection with her discussion of murder in the first degree, that an inference of malice can be drawn from the intentional use of a dangerousness weapon on another person, did not create a substantial likelihood of a miscarriage of justice where the undisputed evidence was that an accomplice fired three shots at the victim from relatively close range.

3. *The cooperation agreements.* Montanez and Rivera were both charged with murder in the first degree and entered into cooperation agreements with the Commonwealth. The defendant filed a motion in limine to preclude the Commonwealth from referencing the cooperation agreements' requirement of truthful testimony, which the judge allowed. See *Commonwealth* v. *Ciampa,* 406 Mass. 257, 264-266 (1989) *(Ciampa).* The prosecutor requested permission to lead the witnesses in order to prevent the mention of truthfulness, which the judge also allowed.

a. *Montanez's testimony.* During the direct examination of Montanez, the prosecutor asked, "[W]hat do you understand the agreement that you have with the Commonwealth to be?" Montanez replied, "To testify truthfully . . . if I testify truthfully, this will be taken into consideration when my case comes up." Defense counsel objected, and at sidebar, the judge indicated that she would instruct the jury to ignore Montanez's reference to truthfulness. Defense counsel agreed that a curative instruction was desired, but moved for a mistrial because he had filed a motion to preclude the exact testimony that was now put before the jury. The judge denied the defendant's motion for a mistrial and instructed the jury to disregard Montanez's reference to "truthful testimony" and that only they "will be determining whether a witness's testimony is truthful and what portions, if any, . . . of the testimony is truthful or not."[6]

---

[6]The judge told the jury:

"Ladies and gentlemen, in regards to this witness's testimony, he

The defendant argues that this curative instruction failed to satisfy the requirements we iterated in *Ciampa, supra.* There, we did not "prescribe particular words that a judge should use," only that we expect a judge to "focus the jury's attention on the particular care they must give in evaluating testimony given pursuant to a plea agreement that is contingent on the witness's telling the truth." *Id.* at 266. The judge's curative instruction satisfies *Ciampa* because it sufficiently warned the jury that the "truthful testimony" requirement of the cooperation agreement could not bear on their ultimate credibility determination of the witness. Moreover, in the judge's final instruction to the jury, she reiterated and elaborated on the *Ciampa* warning.[7]

Any prejudice to the defendant was cured by these two instructions. See *Commonwealth* v. *Arriaga,* 438 Mass. 556, 578-579 (2003) (after testimony on redirect as to truth-telling obligations pursuant to cooperation agreement, *Ciampa* requirements satisfied when "judge immediately cautioned the jury that only they, and not the district attorney, are the determiners of truth [and] repeated a similar instruction in her jury charge").

made a reference to an agreement between he and the Commonwealth. And it referred to his 'truthful testimony.' I'm ordering you to disregard any reference to 'truthful testimony.' The only people . . . who are under oath to determine the truthfulness of a witness's statements are yourselves, the members of the jury. You're the people who will be determining whether a witness's testimony is truthful and what portions, if any, . . . of the testimony is truthful or not. That's for you to determine."

[7]The judge's final instruction to the jury included:

"[D]uring this case you heard the testimony of two witnesses, Alberto Montanez and Adrian Rivera. They testified under an agreement with the Commonwealth that in exchange for their truthful testimony the Commonwealth would take their cooperation into consideration in resolving any criminal pending matters against them. That testimony should be examined with caution and great care. You should consider whether the testimony of these witnesses may be colored in such a way as to further the witness's own interest, including, in that vein, the evidence of any plea agreement which may have been entered into. You may consider that agreement and any hopes the witness may have as to future advantages from the prosecution in evaluating that witness's credibility, along with all the other factors that I have already mentioned. After careful consideration, you may give the testimony of accomplices such weight as you feel it deserves."

b. *Rivera's testimony.* Rivera's cooperation agreement's requirement of truthful testimony was also elicited by the prosecutor, but on redirect examination. On direct examination, Rivera testified that under the terms of his cooperation agreement, his testifying at the defendant's trial would be taken into consideration on his pending charges. During defense counsel's cross-examination, Rivera admitted that he lied to the police twice and he was trying to limit his involvement in the crime. On redirect examination, the prosecutor asked Rivera, "[D]id I ever tell you what you were supposed to testify to?" Rivera replied, "The truth." The judge sustained defense counsel's objection, but reversed her ruling after a sidebar conference at which the prosecutor asserted that she was permitted to inquire as to the witness's obligation of truthfulness when he was questioned about his bias on cross-examination. See *Ciampa, supra* at 264 ("Any attempt at bolstering the witness by questions concerning his obligation to tell the truth should await redirect examination"). The prosecutor elicited further testimony from Rivera that he was told to tell "[t]he absolute truth and nothing but the truth."

The defendant concedes that *Ciampa* permits questions and testimony on redirect examination regarding the requirement to tell the truth. However, he argues that the prosecutor's repeated elicitation from Rivera that he was told to tell the truth, coupled with the prosecutor's closing argument in which she implied that Montanez and Rivera were truthful, constituted impermissible and prejudicial prosecutorial vouching. Because it was not error to elicit the testimony in the context presented at trial, we review the prosecutor's closing argument, to which defense counsel did not object, to determine whether it constituted improper prosecutorial vouching, and, if so, whether such vouching created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wilson*, 427 Mass. 336, 354 (1998).

"Improper vouching occurs if 'an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury.' " *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Commonwealth* v. *Wilson, supra* at 352. The defendant cites to *Commonwealth* v. *Lindsey*, 48 Mass. App. Ct. 641, 645 (2000)

(*Lindsey*), for support. However, in *Lindsay*, the error that led to reversal of the conviction was the judge's failure to give a *Ciampa* instruction after the prosecutor mentioned during his opening statement that the witnesses' cooperation agreements required their truthful testimony. *Id.* at 644-645. The prosecutor's closing argument in *Lindsey* only "edged up to explicit vouching when he said in his closing speech to the jury that 'we have no interest in punishing an innocent person' and '[i]f you are looking for the truth and you find the truth in this matter, the Commonwealth is satisfied that you'll find the defendant guilty.' " *Id.* at 645.

Here, in her closing argument, the prosecutor stated:

> "[Defense counsel] doesn't want you to look for the truth. He doesn't want you to look at the fact that Alberto Montanez and Adrian Rivera have gotten on the witness stand under oath in a court of law and said, 'We willingly went into a car to help out our Latin King brother [the defendant]. And we brought a gun and we knew we were going to mix it up. We knew something bad would happen.'
> . . .

> "So when you assess their credibility, think of what they have been willing to say to you on that witness stand about their role. [Defense counsel] wants you to look at the fact that they can't agree on minor points. Because what's important? They put themself [*sic*] there. They put the gun in Jason Rivas's hand. They got the order from him and Jason fires and Mario Cordova is dead. And they all agree on that."

This statement does not come close to the edge of explicit vouching. The prosecutor was merely responding to defense counsel's concentration on the inconsistencies in the cooperating witnesses' testimony and restating what the jury already knew: Montanez and Rivera testified that they were involved in the shooting. She did not imply that she had independent knowledge of the truthfulness of their testimony. There was no error.

4. *Rivera's testimony regarding gang violence.* The defendant also argues that the judge abused her discretion by admitting, over the defendant's objection, testimony from Rivera that he

believed he would be beaten or killed in jail by members of the Latin Kings gang for making statements to the police and cooperating with the government. This, the defendant contends, constituted prejudicial error because it put before the jury testimony that the Latin Kings, and, therefore, the defendant used violence against cooperating witnesses. Such testimony, he claims, was irrelevant and inadmissible prior bad act evidence.

The testimony was elicited during the Commonwealth's redirect examination of Rivera, and following defense counsel's questioning of his credibility and motives for testifying. In response to questions posed by the prosecutor, Rivera testified that he told police, "I didn't want to go to jail because of the fact that I had made prior statements. And that if I went to the jail, then the [Latin] Kings inside the jail would have a problem with me making a statement." Rivera then testified, over the defendant's objection, that people who cooperate with the government "are usually either beaten up or they attempt to kill them." He also testified that while he was a Latin King, he knew of cooperating witnesses being "beaten up, stabbed, shot at."

In her final instructions to the jury, the judge stated:

> "[T]here was evidence in this case regarding alleged gang association. And I have to instruct you, and I want to instruct you, that any suggestion that the defendant associated with people who belong to a gang cannot be used by you to infer anything about the defendant's character or general propensity to commit a crime. You may not take that as a substitute for proof that the defendant committed the crimes charged.
>
> "The only purposes for which any evidence concerning alleged gang affiliation was introduced was on the issue of what the Commonwealth claims may have been in the defendant's mind at a particular time to form a motive for the offenses involved. The fact that if you believe the defendant associated with some alleged affiliation with a gang does not, standing alone, in any way make the defendant more likely to have committed the crime nor more likely to be involved with violence, and you are not to consider it as such."

"Whether evidence of prior bad acts is relevant, and whether

the probative value of such evidence is outweighed by its potential for unfair prejudice, are determinations committed to the sound discretion of the trial judge and will not be disturbed by a reviewing court absent 'palpable error.' " *Commonwealth* v. *McCowen*, 458 Mass. 461, 478 (2010), quoting *Commonwealth* v. *Fordham*, 417 Mass. 10, 23 (1994). The scope of redirect examination is also within the sound discretion of the trial judge. *Commonwealth* v. *Maltais*, 387 Mass. 79, 92 (1982). The defendant bears the burden of showing an abuse of discretion and its resulting prejudice. See *Commonwealth* v. *Repoza*, 382 Mass. 119, 125 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987). The defendant has failed to carry that burden.

"We repeatedly have held that evidence of gang affiliation is admissible to show motive or joint venture, and have given deference to judges' determinations in that regard." *Commonwealth* v. *Swafford*, 441 Mass. 329, 332 (2004), and cases cited. The judge has a responsibility to minimize the prejudicial effect of gang-related evidence "through voir dire of prospective jurors and limiting instructions." *Id.* Likewise, testimony regarding a witness's fear of retaliation generally is admissible in the discretion of the judge, for purposes of establishing witness credibility, see *Commonwealth* v. *Auguste*, 418 Mass. 643, 647 (1994), or to rehabilitate a witness, *Commonwealth* v. *Holliday*, 450 Mass. 794, 814-815 (2008).

Here, evidence that the defendant was a member of the Latin Kings gang clearly was relevant to the Commonwealth's theory of the case that the defendant, a high-ranking member of the Latin Kings, ordered his subordinates to participate in the killing of the victim. Rivera's testimony that he believed he could be physically harmed for testifying was relevant to rehabilitate him after his motives for testifying had been impeached by defense counsel. Any potential prejudice resulting from the admission of the testimony was mitigated by the judge's individual questioning of prospective jurors during voir dire regarding gang-related evidence, and her final jury instruction that evidence of prior bad acts by the defendant, including association with a gang, only could be considered with respect to motive, and not the defendant's propensity to commit the crime charged. There was no abuse of discretion.

5. *The "followed" juror.* During the trial, a juror brought to the attention of the judge that she thought she may have been followed by someone present at trial as she walked to her automobile the previous evening. A voir dire of the juror followed. The juror could not identify the person specifically, but the judge assumed she was identifying a friend or family member of the defendant. The judge asked the juror three times whether she could remain impartial. The juror replied each time that she could remain fair and impartial. When the judge asked her whether she felt afraid, the juror replied, "No, not by a long shot."

The judge then conducted a voir dire of each juror to determine whether they had heard about the incident and, if so, whether they could remain impartial. Three additional jurors indicated that they had heard of the incident, but each assured the judge that he or she could remain impartial. The defendant moved to discharge the juror who reported the incident and one of the jurors who heard about the incident; alternatively, the defendant requested a mistrial.[8] The judge denied both motions.

"The determination of potential juror prejudice is a matter within the sound discretion of the trial judge." *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998). The judge will conduct individual voir dire if "there exists a substantial risk of extraneous influence[] on the jury." *Commonwealth* v. *Boyer*, 400 Mass. 52, 55 (1987). The record reflects that the judge appropriately questioned the juror who reported the incident and, fearing improper influence on the other jurors, conducted an individual voir dire to determine whether any other juror had heard about the incident and, if so, whether they could remain impartial. All indicated that they could. The judge found no prejudice, and we have no reason to second guess the judge's findings. During jury selection, the judge asked all prospective jurors whether they could remain impartial where gang-related evidence would be introduced. The judge was satisfied that all jurors could remain impartial when presented with gang-related evidence. She was similarly satisfied that no prejudice had

---

[8]Defense counsel informed the judge that the man he believed the juror was identifying was the defendant's uncle. Defense counsel indicated that he asked the man not to return to the trial.

resulted from the juror's reporting her belief that she had been followed. There was no abuse of discretion in the judge's decision not to discharge the jurors or declare a mistrial.

6. *Motion for a new trial.* The defendant's motion for a new trial was entered in the Superior Court on October 24, 2001. See note 2, *supra.* An evidentiary hearing was subsequently held, and the judge denied the motion on May 7, 2010. On appeal, the defendant contends that the judge abused her discretion in denying the motion for a new trial where newly discovered evidence cast doubt on the convictions. See *Commonwealth* v. *Grace,* 397 Mass. 303, 305-306 (1986) (*Grace*).

a. *Standard of review.* A judge may grant a new trial anytime it appears that justice may not have been done. Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." *Grace,* *supra* at 305. "The evidence said to be new not only must be material and credible but also must carry a measure of strength in support of the defendant's position. Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind" (Citations omitted). *Id.* at 305-306. On appeal, we "examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Id.* at 307. "A reviewing court extends special deference to the action of a motion judge who was also the trial judge." *Id.* "A judge's findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record. The judge is the final arbiter of questions of credibility." *Commonwealth* v. *Walker,* 443 Mass. 213, 224 (2005), citing *Commonwealth* v. *Bernier,* 359 Mass. 13, 16 (1971).

b. *The Gilday letter.* After trial, Mark A. Gilday, an inmate at the Hampshire County jail and house of correction with Rivera, sent a letter to the Hampden County district attorney stating that Rivera told him he had lied about Padilla answering the defendant's telephone call on the night of the shooting, and that Rivera had been promised a sentence of between two and four

years for his testimony. Gilday later averred the same in an affidavit, and testified at the evidentiary hearing on the motion for a new trial.

The judge did not find Gilday's affidavit or testimony credible. She described him as "a career criminal who has spent over twenty years honing his legal skills in various law libraries within the Department of Correction." She noted, for example, that while Gilday claimed that on January 12, 2001, Rivera asked him to assist in the drafting of a written contract with the district attorney, a cooperation agreement with the district attorney had already been executed by Rivera's attorney on April 13, 2000. Even if Gilday's allegations were true, the judge found that they would be cumulative of other impeachment evidence that was available to the defendant at the time of trial. There was no abuse of discretion here.

c. *The cooperation agreement with Rodriguez.* The defendant also argues that the judge abused her discretion in denying his motion for a new trial on the ground of newly discovered evidence relating to an alleged cooperation agreement between the Commonwealth and Rodriguez, who testified at the defendant's trial as an eyewitness to the shooting.[9]

During the trial, on the evening following Rodriguez's testimony, his attorney on an unrelated criminal matter,[10] Edward Fogarty, contacted the prosecutor's office claiming that his client in fact had some type of agreement with the prosecutor regarding "some consideration" for his testimony. Defense counsel was informed of Attorney Fogarty's contact, and because no such agreement had been revealed to the defense or offered as evidence during Rodriguez's testimony, the defendant moved for a mistrial. The judge held a voir dire at which Rodriguez and Attorney Fogarty testified. The Commonwealth asserted that there was in fact no agreement between the prosecutor's office and Rodriguez.

Although no written cooperation agreement was produced, both Rodriguez and Fogarty testified that it was their under-

---

[9]Luis Rodriguez was a guest at Jenette Vasquez's apartment on the night of the murder. He was not alleged to have been involved in any way. He testified at the Rivas trial as well as the defendant's trial.

[10]Rodriguez had pending drug offenses at the time of the defendant's trial.

standing that there was some agreement for consideration based on a conversation with the prosecutor.[11] The judge did not find that there had been an agreement, but ruled that the defense could recall Rodriguez to the stand to testify as to his belief about the existence of an agreement for consideration. The defendant declined to recall Rodriguez to the stand.

In support of his motion for a new trial, the defendant produced an unsigned cooperation agreement addressed to Fogarty and written on the district attorney's letterhead. Fogarty apparently found the letter while cleaning out his files. The letter stated, "This letter confirms the agreement between your client . . . and the Commonwealth . . . ." The judge concluded that this unsigned document did not corroborate the existence of an agreement and that, at most, it confirmed that the prosecutor had suggested a deal was possible. Moreover, the judge found that the new evidence did not alter the fact that the defendant had the chance to make the jury aware that the defendant thought he was testifying pursuant to a cooperation agreement, but chose not to do so. We discern no abuse of discretion.

7. *General Laws c. 278, § 33E.* The defendant argues that the facts adduced at trial support involuntary manslaughter as opposed to murder in the first degree. We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether the record supports this contention, as well as to determine whether the conviction of murder gives rise to a substantial likelihood of a miscarriage of justice for any other reason not raised on appeal.

The jury convicted the defendant of murder in the first degree based on sufficient evidence of the following: the defendant, who was a high-ranking member of the Latin Kings street gang, had a quarrel with the victim and his friend, Olmo; on the night of the murder, and three prior occasions, the defendant confronted or threatened the victim and Olmo; the defendant instructed four of his subordinates to retrieve a gun and meet

---

[11]Rodriguez testified that the prosecutor told him that "she can help me on my drug cases, that she won't promise me nothing but she will try to do something." Fogarty testified that there was nothing in writing, but that the prosecutor had "said something to the effect that she could help him on his case," without any specifics.

him where he knew the victim was watching a movie; and the defendant commanded Rivas to shoot the victim as he stood in a doorway approximately twenty feet away. The jury heard testimony from eye witnesses as well as the defendant's subordinates who helped carry out the shooting. We conclude that the conviction of murder in the first degree is supported by ample evidence. We also find no substantial likelihood of a miscarriage of justice.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*