# United States Court of Appeals
## For the First Circuit

No. 15-1143

JOSE ROSARIO,

Petitioner, Appellant,

v.

GARY RODEN, Superintendent;
MARTHA M. COAKLEY, Attorney General of
the Commonwealth of Massachusetts,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Kayatta, Circuit Judges.

Max D. Stern, with whom Todd & Weld LLP was on brief, for
appellant.
Eva M. Badway, Assistant Attorney General, Criminal Bureau,
with whom Maura Healey, Attorney General of Massachusetts, was on
brief, for appellees.

December 7, 2015

**LYNCH**, **Circuit Judge**.  Jose Rosario was convicted in September 2000 of the first degree shooting murder of Mario Cordova in Springfield, Massachusetts.  He was sentenced to life imprisonment.[1]  There is no claim Rosario was the shooter.  He was convicted because he ordered the shooting, which was carried out by a member of the Latin Kings gang subordinate to him.  The state trial court denied his motion for a new trial, and the Supreme Judicial Court (SJC) affirmed his conviction.  Commonwealth v. Rosario, 950 N.E.2d 407, 411 (Mass. 2011).  That opinion contains a full recitation of the facts, to which we refer the reader.

Before us is Rosario's appeal from the district court's denial of his habeas corpus petition, a denial we review de novo.  Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006).  If the state court had ruled on the due process claim raised by the petitioner, we would review the findings of the state high court through the deferential lens of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  See 28 U.S.C. § 2254.  But we do not do so here.  That is because, on our reading, the SJC did not address the precise constitutional due process issue presented here.  One might consider, given the high quality of that court, whether that

---

[1]  Rosario was also convicted of the state law crimes of unlawful possession of a firearm, unlawful carrying of a firearm, and unlawful discharge of a firearm within 500 feet of a dwelling or other building.  He received concurrent sentences for these convictions.

was because the issue was not clearly argued to it. But the Commonwealth has chosen not to defend on the basis that this claim was not exhausted before the SJC, and it is a close question whether the Commonwealth has waived reliance on the exhaustion requirement. See 28 U.S.C. § 2254(b)(3). Because we affirm the denial of the petition on the merits, we can bypass the exhaustion question. See id. § 2254(b)(2).

And so we review de novo the due process violation claim asserted in this case. See Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013); Clarke v. Spencer, 582 F.3d 135, 145 (1st Cir. 2009). The claim essentially is that the Commonwealth failed to disclose a document which was evidence of a possible cooperation agreement between one prosecution witness and the Commonwealth. Had the document been timely disclosed during or before trial, it could have been used to impeach the testimony of the witness, Luis Rodriguez, as described below, and, possibly could have shown the prosecution in a bad light for withholding evidence.

The Commonwealth does not dispute that the document was not disclosed, and it assumes in its brief that the document's production may have been favorable to the accused. However, the Commonwealth argues that the document was immaterial because its disclosure would not have affected the result of the proceeding. We find on this habeas petition, that had the document been timely disclosed to the defense, there is no "reasonable probability"

that the result of the proceeding -- conviction -- would have been different.  See Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). Our confidence in the outcome of conviction is not undermined. See United States v. Bagley, 473 U.S. 667, 682 (1985).

I.

A.   The Suppressed Material

Rodriguez was a prosecution witness at trial and testified as an eyewitness to the shooting.  He was not alleged to be involved with the shooting in any way.  Rodriguez testified that on the night of the shooting, he was at the apartment of a friend, Jenette Vasquez, with a number of other people, including Rosario.  He testified that at some point in the evening, he heard Vasquez on the phone talking to Johnel Olmo, a friend of the victim.  Rosario asked Vasquez for the phone, and Rodriguez testified that he heard Rosario tell Olmo, "I'm your worst nightmare."

The evening after Rodriguez testified at Rosario's trial, Edward Fogarty, Rodriguez's attorney on unrelated pending drug offenses, contacted the prosecutor's office, saying that Rodriguez believed he and the Commonwealth had an agreement involving some sort of consideration for Rodriguez's testimony. The prosecution then informed Rosario's counsel about its conversation with Fogarty.

- 4 -

After the issue was raised to the court, the judge held a voir dire. The Commonwealth claimed there was no agreement, and both Rodriguez and Fogarty testified that it was their understanding that there was an agreement. Rodriguez testified that the prosecutor said that "she can help . . . [him] on [his] drug cases; that she won't promise [him] nothing but she'll try to do something." Fogarty testified that although there was nothing in writing, the prosecutor "said something to the effect that she could help him on his case," without giving specifics.

At that time, the trial judge did not make a finding regarding whether there was an agreement but said that Rosario could recall Rodriguez to the stand, where he could be questioned about his belief regarding an agreement. Rosario's counsel declined, arguing, "the problem is calling the witness back in the middle of the trial after the jury has seen him and has seen that he's left. I don't think this can be corrected." Rosario's counsel moved for a mistrial, which the court denied because it thought that "whatever prejudice that may be shown by the defendant can be rectified at this stage of the trial."

The next day, Rosario's counsel requested to call Rodriguez and Fogarty to testify about their impressions of their meeting with the prosecution. He also said that he would like to disclose -- either through testimony or a stipulation from the Commonwealth -- that this information came to Rosario's counsel's

attention only the prior day.  He argued that challenging the prosecutor's credibility was within Rosario's due process rights under Kyles v. Whitley.  The trial court declined to allow testimony of when Rosario's counsel became aware of the possible agreement.  Rosario's counsel said that "[i]f the ruling of the court is that I can't get into the area that I want to get into (and I object to the ruling) then I will not call Mr. Rodriguez back to the stand."

After the trial, when Fogarty was cleaning out his files, he found an unsigned document, a purported cooperation agreement dated May 1, 2000, on the district attorney's letterhead addressed to Fogarty saying, "This letter confirms the agreement between your client, Louis Ramon Rodriguez, . . . and the Commonwealth . . . ."  It listed six terms of agreement, and it said it was from the assistant district attorney.  In October 2001, Rosario filed a motion for a new trial with the SJC, which remanded it to the Superior Court.  That motion was heard by the same judge who presided over the trial.  She held an evidentiary hearing on the motion in November 2002.  In May 2010, the trial judge denied the motion for a new trial, finding that at most, the letter confirmed that the prosecutor thought a deal was possible, not

that it corroborated the existence of an actual agreement.[2] The judge also found that the new evidence did not change the fact that Rosario's counsel chose not to recall Rodriguez to let the jury know that Rodriguez believed there was a cooperation agreement.

Rosario appealed to the SJC, raising a number of issues, including the denial of his motion for a new trial. The SJC found no abuse of discretion in the trial court's order and, as said, affirmed. In 2012, Rosario filed a petition for a writ of habeas corpus in the Massachusetts federal district court, alleging that the trial court denied his right to due process, which the district court denied. Rosario v. Roden, No. 12-12172-DJC, 2014 WL 7409584 (D. Mass. Dec. 31, 2014).

B.   Disclosure and Prejudice

Under Brady v. Maryland, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Impeachment evidence "falls within this general rule," when a witness's reliability can determine the defendant's guilt or innocence. Giglio v. United

---

[2] We note that what was relevant to establishing Rodriguez's motive to help the prosecution was his belief that he had a deal, not whether Rodriguez's belief was correct.

- 7 -

States, 405 U.S. 150, 154 (1972). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433-34 (quoting Bagley, 473 U.S. at 682). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. at 434 (quoting Bagley, 473 U.S. at 678).

There were two main prosecution witnesses -- both Latin Kings members subordinate to Rosario -- whose testimony was essential to the verdict. Both acknowledged they had cooperation agreements, but that did not dissuade the jury from convicting Rosario. Rodriguez's testimony certainly supported the verdict in the sense that he corroborated testimony about the locations of the defendant and other players at various times.

But the main import for the prosecution of Rodriguez's testimony was that he heard Rosario tell Olmo, "I'm your worst nightmare."[3] Significantly, there were two other witnesses who testified as to the "nightmare" statement. First, Sharoll Burgos, who was at Vasquez's house as well, testified to hearing Rosario say that. When the assistant district attorney discussed the statement at closing argument, she said "Sharoll Burgos testified.

---

[3] Rodriguez did not mention this statement to the police in his initial interview with them.

'I'll be here when you get here.  I'm your worst nightmare.'"  When the prosecutor mentions the "nightmare" statement a second time, she again attributes it to Burgos, not Rodriguez.  Further, the assistant district attorney did not ever in closing argument attribute the statement to Rodriguez's testimony.  In fact, the prosecutor's only mention of Rodriguez in closing argument was in the context of the shooting itself where, in response to an argument made by Rosario's counsel, she says, "Do you really think that Luis Rodriguez remembers, oh, he was fixated straight ahead?"  Second, Olmo himself testified that Rosario made the statement to him.  Rosario concedes that other than for his testimony about the statement, Rodriguez "admittedly, was . . . a relatively minor witness for the Commonwealth."

Rosario contends that Rodriguez was the only neutral witness because Burgos was romantically interested in Olmo, "thereby giving her a reason to corroborate whatever his story was."  He also notes that Burgos did not mention that Rosario was at Vasquez's apartment when she first spoke to the police and that Burgos told the police about Rosario's threat only after Olmo gave a statement to the police.  The defense counsel cross-examined Burgos about this at trial.  And the defense counsel also impeached Rodriguez with prior convictions and cross-examined him about inconsistencies between his statements to the police -- where in the report of his first statement, there was no mention of

Rodriguez hearing Rosario say anything, and in the report of the second statement, it said that Rodriguez heard Rosario say, "I'm your worst enemy" (not "nightmare") -- and his testimony on the stand.

There was also other independent evidence from which the jury could conclude beyond a reasonable doubt that Rosario had ordered the shooting. The jury learned about three incidents where Rosario confronted Olmo and the victim before the night of the murder. Rosario's disinterested coworker told the police that the day after the shooting Rosario was acting differently and said, "I snuffed somebody." Rosario also called Olmo the day after the shooting to say, "I told you something bad would happen . . . Latin King love." There was no reasonable probability that the unsigned letter of a possible cooperation agreement would have affected the outcome.

Finally, Rosario argues that evidence of the suppression itself was material because it could have suggested that the prosecution had something to hide and that "the Commonwealth had such a vested interest in sticking to its theory of [the] prosecution that it felt the need to offer Rodriguez a cooperation agreement." Ultimately, this claim too fails. Unlike Kyles, which involved several pieces of evidence favorable to the defendant that if disclosed would have born light on the "thoroughness and even the good faith of the investigation," 514 U.S. at 423-29,

- 10 -

445, or <u>United States</u> v. <u>Flores-Rivera</u>, which involved a letter a witness sent to the prosecutor that the prosecutor acknowledged having, disclosure of which could have allowed "counsel to call into question the credibility of . . . implicitly, the lead prosecutor," 787 F.3d 1, 11–12, 19 (1st Cir. 2015), here, whether there was a cooperation agreement is itself very much in dispute.

At the motion for a new trial hearing, the assistant district attorney maintained that no agreement was offered and that the letter should not have been sent. Further, the letter was unsigned, and while it began with Rodriguez's name on it, at the end, it included an "Acknowledgement of Agreement" with the name of an unrelated party, suggesting that while the Commonwealth may have contemplated a cooperation agreement, the document was not a final draft. The letter would have had minimal value in calling the prosecutor's motives into question, and there is no reasonable probability that it would have affected the jury verdict.

## II.

We <u>affirm</u> the denial of the habeas petition.