IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35668-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GREGG A. LOUGHBOM, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, A.C.J. — Gregg Loughbom appeals his convictions for controlled

substance violations.  We affirm.

FACTS

Mr. Loughbom was charged with three felony drug trafficking offenses after he

distributed drugs to a confidential informant.  He exercised his right to a jury trial and

the State presented testimony from several witnesses, including the informant and two

investigating law enforcement officers.

The informant testified that he had arranged to purchase drugs from Mr. Loughbom

through a friend named "Kevin."  2 Report of Proceedings (RP) (Oct. 18, 2017) at 139.

The informant testified that for the first transaction he went to Mr. Loughbom's garage

and purchased $30 worth of methamphetamine directly from Mr. Loughbom.  On the

second occasion, the informant obtained painkillers through an intermediary named

"Wanda." *Id*. at 130-31. This transaction took place at Wanda's apartment. Although

Wanda had supplied the informant with the drugs, the informant knew Mr. Loughbom

was involved because Mr. Loughbom showed up after the exchange to collect the buy

money. During his testimony, the informant stated that he started working with law

enforcement after being charged with two crimes.

The two law enforcement officers described their investigation of Mr. Loughbom

and their work with the informant. The officers discussed the process of the controlled

buys and the substances procured by the informant. The officers also described what they

saw during their surveillance of the informant on the dates of the two transactions. At

the time of the first buy, the officers saw the informant going in and out of a residential

garage.[1] Although the officers did not see Mr. Loughbom at that time, they did observe

his truck. *Id*. at 117, 119, 161. For the second transaction, the officers followed the

informant to an apartment complex. Again, the officers did not see Mr. Loughbom.

Nor did they see his truck. However, the day after the second exchange, Mr. Loughbom

---

[1] The officers alternatively referred to the area accessed by the informant as the "building," "residence," and "garage." 2 RP (Oct. 18, 2017) at 108, 149. Given that a residence can include a garage, the differences in word choices were not necessarily inconsistent. No claim of inconsistency was raised during trial.

was observed driving his truck and entering the residence that had been the location of

the first transaction. *Id*. at 160.

The jury convicted Mr. Loughbom of delivery of methamphetamine and

conspiracy to do the same. He was acquitted of the charge alleging he delivered

painkillers. Mr. Loughbom appeals his convictions.

ANALYSIS

*Prosecutorial misconduct*

Mr. Loughbom claims the prosecutor committed misconduct by (1) repeatedly

mentioning the "war on drugs" throughout trial and (2) referencing Mr. Loughbom's right

to silence during summation. Because no misconduct objections were voiced at the time,

Mr. Loughbom must establish that the prosecutor's comments were so flagrant and ill

intentioned that they caused an enduring prejudice that could not be neutralized by a

curative instruction. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 165, 410 P.3d 1142

(2018). This burden has not been met.

*War on drugs comments*

Mr. Loughbom identifies five times that the State referenced the war on drugs:

1. Voir dire: In questioning the jury venire, the prosecutor engaged jurors in the

following discussion:

Now, kind of getting into a little bit about the nature of this case, this, as mentioned, [the judge] stated this involves two counts of Delivery of a Controlled Substance and one count of Conspiracy to Deliver a Controlled substance. Are there any among you who believe that we have a drug problem in Lincoln County? Wow, okay. Just about everything.

Is there anyone who feels that we don't? Just so I can eliminate the—

THE JUROR: It's not that I don't. It's—I'm just very new to the area and I don't know.

[THE PROSECUTOR]: Okay. Okay. That's fine.

Anyone else who thinks we don't have a problem in the area or—or don't have one? Okay.

So nearly—pretty much everyone except No. 25.

2 RP (Oct. 18, 2017) at 52-53. This line of questioning was immediately followed

by questions about the jurors' positions regarding decriminalization of marijuana.

2. <u>Opening statement</u>: The prosecutor began his statement by informing the jurors,

"The case before you today represents yet another battle in the ongoing war on drugs

throughout our state and throughout our nation as a whole." *Id*. at 87.

3. <u>Witness testimony</u>: During direct examination of one of the law enforcement

officers, the prosecutor asked for an explanation of how confidential informants come

to work with the police. The officer responded:

Various ways. . . . [S]ometimes we deal with confidential informants that are not under [a quid-pro-quo agreement] they just come in because they want to change or help fight the drug problem that we have in our county, most of the time, though, it's somebody that has charges that is willing to help us with furthering our investigations.

4

*Id*. at 103-04.

4. Summation: During closing argument, the prosecutor returned to his theme from opening, commenting: "The case before you represented another battle in the ongoing war on drugs throughout our state and the nation as a whole." 1 Narrative Report of Proceedings (Oct. 18, 2017) at 183.

5. Rebuttal: During rebuttal argument, the prosecutor responded to defense counsel's criticisms of the informant, explaining:

> [L]aw enforcement cannot simply pick and choose their [confidential informants] to be the golden children of our society to go through and try and complete these transactions as they go forward in the, like I said, the ongoing war on drugs in this community and across the nation.

2 RP (Oct. 18, 2017) at 168.

The State's repeated references to the war on drugs were imprudent, but ultimately fell short of misconduct. The use of a loaded term such as the "war on drugs" is problematic because it may suggest that the jury's role is not merely to weigh the evidence and decide guilt, but to play a part in the government's larger effort to eradicate illegal drugs. *See State v. Echevarria*, 71 Wn. App. 595, 598-99, 860 P.2d 420 (1993). Fortunately, that is not what happened here. The State's references to the war on drugs were not made in the context of arguing why the jury should convict. Instead, the State appears to have mentioned the war on drugs in order to deflect potential anti-government

5

bias. From the context, it appears the prosecutor sought to address concerns about why

the government might be involved in the unsavory business of undercover drug buys

and the use of criminal informants. It also appears that, during voir dire, the prosecutor

wanted to examine whether any potential jurors were opposed to the government's drug

policy. It would have been better for the State to address these concerns without referring

to the war on drugs. Nevertheless, the State's comments did not inflame the jury's

passions against Mr. Loughbom.

The absence of any objection to the State's references to the war on drugs

affirms our view that the comments "did not appear critically prejudicial to [the defense]

in the context of the trial." *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990).

Nevertheless, had Mr. Loughbom and his attorney perceived something untoward, a

curative instruction would have been sufficient to address potential prejudice. *See, e.g.*,

*United States v. Beasley*, 2 F.3d 1551, 1559-60 (11th Cir. 1995) (curative instruction

sufficient to offset prejudice caused by prosecutor's "clearly improper" appeal to a war on

drugs). Mr. Loughbom's claim that the State committed misconduct by appealing to the

passions of the jury through its references to the war on drugs does not warrant reversal.

### Comment on the right to silence

Mr. Loughbom contends the prosecutor improperly commented on the right to

silence[2] by making the following statement during rebuttal:

> And, finally, Gregg Loughbom didn't deny anything. [Defense counsel] had stated that Gregg Loughbom denied being any part of this or denied being at these locations. That's not true. Gregg Loughbom didn't deny anything. He didn't testify and there was no evidence that he ever denied—no evidence presented that he ever denied anything.
> Now, I'm not suggesting that you can use his silence against him. Of course not. There's an instruction against that. I'm merely suggesting that at no time did Gregg Loughbom ever deny that as she has presented in her arguments.

2 RP (Oct. 18, 2017) at 170.

We do not find anything improper in these statements. "[P]rosecutors are entitled to respond to defense counsel's arguments." *Phelps*, 190 Wn.2d at 167. This is what appears to have happened.[3] After defense counsel apparently suggested Mr. Loughbom had affirmatively denied being part of the controlled buys, the prosecutor simply pointed out that this was a mischaracterization of the record. Given the nature of the alleged mischaracterization, the prosecutor's comments necessarily touched on Mr. Loughbom's right to silence. But because there was no indication that the prosecutor was attempting

---

[2] U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

[3] Due to a technical failure, 103 minutes of the trial were not recorded or transcribed. Although the parties have reconstructed a narrative report of proceedings regarding the prosecutor's closing argument, the record contains no narrative of defense counsel's argument. The report of proceedings only contains a few lines of defense counsel's closing. We therefore must infer the contents of defense counsel's closing from context.

to use Mr. Loughbom's silence to the State's advantage or to "suggest to the jury that the silence was an admission of guilt," the prosecutor's statements were not improper. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996), *overruled on other grounds by Salinas v. Texas*, 570 U.S. 178, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013).

*Ineffective assistance of counsel*

To establish a claim of ineffective assistance of counsel, Mr. Loughbom must show both that his trial counsel's performance was deficient and, but for the deficient performance, there is a reasonable probability the trial's outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 691-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Failure to meet either prong of this test is dispositive of an ineffective assistance claim. *State v. Berg*, 147 Wn. App. 923, 937, 198 P.3d 529 (2008). Mr. Loughbom does not meet this burden.

Mr. Loughbom first argues that his trial counsel performed deficiently by failing to preserve the aforementioned allegations of prosecutorial misconduct. However, as has been explained, we do not find any clear instances of misconduct. Thus, defense counsel did not perform deficiently by failing to object. *See State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011) (failure to meet flagrant and ill-intentioned standard indicates

8

that attorney's performance was not deficient for failing to object to prosecutor's

statements).

Mr. Loughbom also argues his attorney improperly failed to object to hearsay

testimony from one of the law enforcement officers. The alleged hearsay occurred

during the following exchange with the law enforcement officer:

> [OFFICER]: On the first controlled buy, when the confidential informant contacted me, the person that the informant had been in touch with said that he had somebody coming in that day that would bring the methamphetamine.
> [DEFENSE COUNSEL]: Objection, Your Honor, that's hearsay.
> THE COURT: That would be. It's hearsay. Stricken.
> [OFFICER]: Okay.
> THE COURT: The jury should disregard that statement.
> [OFFICER]: At that time it was identified that the vehicle, a red pickup, with a black hood, and what was associated with that person.
> [PROSECUTOR]: Okay.
> [OFFICER]: And that vehicle was seen at the residence when we did the controlled buy. We also got the registration off of it after the controlled buy, which returned to the defendant—
> [PROSECUTOR]: Okay.
> [OFFICER]: —as the registered owner.

2 RP (Oct. 18, 2017) at 117.

We disagree with Mr. Loughbom's hearsay claims. When the officer attempted

to relay a hearsay statement from the informant, defense counsel objected. The court

sustained that objection. It ordered the hearsay statement struck from the record and

instructed the jury to disregard it. We presume the jury followed the court's instruction to

9

disregard stricken evidence.[4]  *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998).

When the officer testified that a red pickup with a black hood was associated with

"that person," he was primarily describing what he had seen during surveillance of the

controlled buy.  It is unclear whether the officer's reference to "that person" relayed a

hearsay statement regarding the source of the drugs' supply.  But to the extent that it was

hearsay, the statement supported Mr. Loughbom's theory that his wife, Doris Loughbom,

was the individual who was driving the truck and who was responsible for the drug sales.

2 RP (Oct. 18, 2018) at 118-19, 162.  The failure to object can therefore be ascribed as a

tactical decision and is not indicative of deficient performance.  *State v. Kyllo*, 166 Wn.2d

856, 863, 215 P.3d 177 (2009).[5]

*Remaining claims*

In addition to the foregoing claims, Mr. Loughbom argues his convictions should

---

[4] During the court's initial instructions, the jury was told to disregard stricken evidence.  2 RP (Oct. 18, 2017) at 85.

[5] Although not argued by Mr. Loughbom, the officer likely relayed a hearsay statement when he testified that the red truck was registered to Mr. Loughbom.  The officer's testimony may have been based on reading the vehicle registration form or a report of information from the Department of Licensing.  Either way, the statement would be hearsay.  Nevertheless, we cannot fault defense counsel for failing to object.  Vehicle registration information can easily be proved through the admission of a certified public document.  RCW 5.44.040.  Defense counsel likely made a strategic choice not to lose credibility with the jury by quibbling over the State's method of establishing an uncontested and readily provable fact.

No. 35668-0-III
*State v. Loughbom*

be reversed based on cumulative error and insufficiency of the evidence. Neither

contention requires significant discussion. Because Mr. Loughbom has not identified

any clear instances of prosecutorial misconduct or ineffective assistance of counsel, his

convictions are not vulnerable to challenge based on cumulative error. With respect to

the sufficiency of the State's evidence, Mr. Loughbom complains the State failed to

corroborate the informant's testimony. This is an argument that goes to the weight of the

evidence. It is not a cognizable ground for a sufficiency challenge. *State v. Cardenas-*

*Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

## CONCLUSION

The judgment and sentence is affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____, A.C.J.
Pennell, A.C.J.

I CONCUR:

_____
Korsmo, J.

11

No. 35668-0-III


FEARING, J. (dissent) —

   *America's public enemy number one – in the United States – is drug abuse.  In order to fight and defeat this enemy, it is necessary to wage a new, all-out offensive. . . .  This will be a worldwide offensive.*  President Richard Nixon, June 17, 1971 press conference

   *Unfortunately, while we had won an important victory, we had not won the war on drugs.  By 1975, it was clear that drug use was increasing, that the gains of prior years were being lost, that in human terms, narcotics had become a national tragedy.  Today, drug abuse constitutes a clear and present threat to the health and future of our Nation.  The time has come to launch a new and more aggressive campaign to reverse the trend of increasing drug abuse in America.*  President Gerald Ford, April 27, 1976 special message to Congress

   *For the sake of our children, for the sake of all the magnificent accomplishments of the American past, today I ask for your support and the support of our people in this effort to fight the drug menace.*  President Ronald Reagan, October 14, 1982 remarks announcing federal initiatives against drug trafficking and organized crime

   *Good evening.  This is the first time since taking the oath of office that I felt an issue was so important.  So threatening that it warranted talking directly with you.  The American people.  All of us agree that the greatest domestic threat facing our nation today is drugs. . . .  To win the war against addictive drugs like crack [cocaine] will take more than just a federal strategy.  It will take a national strategy.*  President George H. W. Bush, September 15, 1989 nationally televised address to the nation

   *Tonight I am nominating General Barry McCaffrey as America's new drug czar.  General McCaffrey has earned three Purple Hearts and*

> *two Silver Stars fighting for this country. Tonight I ask that he lead our Nation's battle against drugs at home and abroad. To succeed, he needs a force far larger than he has ever commanded before. He needs all of us. Every one of us has a role to play on this team.* President Bill Clinton, January 23, 1996, State of the Union address

> *Illegal drugs are the enemies of ambition and hope and when we fight against drugs we fight for the souls of our fellow Americans.* President George W. Bush, December 14, 2001 address to the nation

This appeal concerns prosecutorial misconduct in eliciting the politically charged mantra of the war on drugs in order to gain an emotional response from the jury and insure a conviction of the accused. This dissent discusses prosecutorial misconduct in general, details the inadequate response by reviewing courts to misconduct, outlines facts in this appeal, lists principles for reviewing alleged prosecutorial misconduct, explains the difficulty in assessing whether to reverse a conviction based on these declared principles, pinpoints rules regarding a prosecuting attorney's solicitation of the war on drugs, reviews Washington's strong bias against the State's attorney mentioning the war on drugs, examines how foreign courts handle a prosecutor's intonation of the war on drugs, analyzes the prejudice to Gregg Loughbom from the adjuration of the war on drugs in light of the teachings of the courts, and concludes that Loughbom's conviction must be reversed.

A prosecuting attorney holds immense power in the American system of justice, abuse of which authority can destroy an individual's life, liberty, property, finances, and reputation. With this power in mind, I applaud the overwhelming majority of

2

Washington State prosecutors for dutifully following the principles of trial advocacy and ensuring a fair trial to the accused. Hundreds of trials proceed throughout the state each day without any incident of prosecutorial misconduct. Still, this court receives too many appeals wherein an occasional prosecutor travels beyond zealous advocacy and infringes on an accused's right to a fair trial. Another court has also lamented the number of times it was presented with improper prosecutorial comments. *United States v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997).

Our court, like other courts, does little, if anything, to end instances of prosecutorial misconduct. Indeed, under the current state of the law, we cannot reverse most convictions infected by misconduct. The appendix contains thirty-five Washington appellate decisions since the beginning of 2018, wherein the court found prosecutorial misconduct but affirmed convictions. In other cases, this court did not either address whether prosecutorial misconduct occurred or wrote that the conduct "may have been improper" but instead simply determined that the appellant had failed to show sufficient prejudice. In one decision, this court wrote that the prosecutor's comments came close to the line of misconduct but the defendant failed to establish the necessary harm for reversal. *State v. Gonzalez*, No. 75845-4-I (Wash. Ct. App. July 9, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/758454.PDF, *review denied* 192 Wn.2d 1004, 430 P.3d 256 (2018). This appeal should be an exception. The prosecuting attorney

uttered the inflammatory paleologism "war on drugs" as the theme for the prosecution of Gregg Loughbom.

First some facts. In December 2016, the Lincoln County Sheriff's Department targeted Gregg Loughbom for controlled buys of controlled substances. The sheriff's department employed, without any monetary compensation, A.C. as an informant to pose as a buyer of drugs from Loughbom.

According to A.C., he agreed to assist as a confidential informant after being arrested for delivery of controlled substances and for "badgering" a witness. Report of Proceedings (RP) at 135. A.C., during Gregg Loughbom's trial, stated law enforcement falsely accused him of harassing a lady into signing a false statement. According to A.C., he did not harass the lady but only overheard someone else encourage the lady to render a false statement, although A.C. never identified the someone else.

A.C. admitted he sent a text to a lady named Chantal that read "Bad Bitch Chantal." RP at 137. Chantal was the victim of car theft committed by a lady friend of A.C. A.C. wanted his friend released from jail. Nevertheless, according to A.C., someone else used his cellphone to send Chantal a text that read "snitches end up in ditches." RP at 137. A.C. did not identify the sender.

Lincoln County sheriff deputies made no promises to A.C. other than to relay news of his cooperation to the prosecuting attorney for purposes of a deal. A.C. testified at Gregg Loughbom's trial that he had yet to resolve the two or more charges of delivery

4

of a controlled substance and the one charge of badgering a witness.  The charges against

him still pended as he cooperated as an informant.  A.C. hoped to receive a reduced

sentence or "to go home."  RP at 140.

Lincoln County Sheriff Detective Roland Singer and Sergeant Mike Stauffer first

sent A.C. to purchase narcotics from Gregg Loughbom on December 20, 2016.  The law

enforcement officers handed A.C. $30 of marked bills to purchase the merchandise.  A.C.

went to 103 Main Street, Davenport, the home of Everett Kevin Costello and Doris

Loughbom, Loughbom's wife.  A.C. was a friend of Costello.  We do not know why

Loughbom's wife lived with another man.  A.C. had never before met Loughbom.

Detective Roland Singer and Sergeant Mike Stauffer watched A.C. walk to 103

Main Street and enter the home.  The officers could not see A.C. inside the residence.

According to the officers, A.C. remained in the abode for fifteen minutes.  Mike Stauffer

testified inconsistently as to whether A.C. entered a residence or garage, but only testified

that A.C. exited from a residence.  He declared:

> Q. What could you see, if anything, of that first exchange?
> A. Well, we couldn't see anything.  We watched—myself and the
> detective, watched the CI up and goes to the residence that he was going to,
> enters the residence or the garage where they were at, and disappears and
> then we just watch see if anybody leaves or comes back out.  And then after
> a period of time the CI comes out of the residence and then heads back
> towards us.

RP at 149.  Roland Singer limited his testimony to A.C. being inside a residence.  Neither

Detective Roland Singer nor Sergeant Mike Stauffer saw Gregg Loughbom or drugs and

5

money exchange hands. Singer and Stauffer observed A.C. leave the residence, and A.C. walked directly to the officers. A.C. handed Detective Singer clumped paper with a crystal substance therein. Law enforcement later confirmed the crystal substance to be methamphetamine. Law enforcement never fingerprinted the paper.

A.C.'s testimony at trial differed from the narratives of the two Lincoln County sheriff deputies. According to A.C., he purchased the methamphetamine from Gregg Loughbom in an adjacent garage. Contrary to testimony of the law enforcement officers, A.C. never entered the residence on Main Street.

While waiting for A.C. to return to him on December 20, Detective Roland Singer saw a red pickup with a black hood by the residence. Singer obtained the registration number for the pickup and, after checking state records, discerned Loughbom to be the registered owner of the truck.

Detective Roland Singer and Sergeant Mike Stauffer returned to 103 Main Street later on December 20. The officers saw no one outside the residence. The sheriff deputies did not know who all resided at the residence. The deputies never saw Loughbom near the truck that day.

On December 31, 2016, Detective Roland Singer and Sergeant Mike Stauffer sent A.C. with $50 of marked bills to 514 Ross Street, apartment D-6, in Davenport. A woman named Wanda in addition to A.C. resided at the apartment. We do not know the relationship between Wanda and A.C. Singer and Stauffer viewed A.C. enter and exit the

6

apartment, and A.C. remained inside for eleven minutes. Neither officer observed A.C. inside the apartment or saw any drugs or money exchanged. Neither officer saw Gregg Loughbom. A.C. returned with a small cigarette cellophane wrapper with tape around it. Ten oblong yellow pills lay inside the wrapper. Law enforcement later identified the pills as hydrocodone.

According to A.C., Wanda gave him the hydrocodone. A.C. averred that Wanda obtained the hydrocodone from Gregg Loughbom, but the record does not show that A.C. saw Loughbom give Wanda the medications or that Wanda stated she received the pills from Loughbom. Loughbom was not at the residence on December 31. According to A.C., Loughbom came to the residence the next day to retrieve the purchase money from Wanda. Loughbom does not know if Wanda handed Loughbom the same bills that he gave Wanda. In the meantime, A.C. and Wanda cared for Loughbom's dog.

On the morning of January 1, 2017, Sergeant Mike Stauffer drove near the Ross Street apartment. With binoculars, Stauffer saw Gregg Loughbom exit the apartment and enter a red truck. Loughbom carried nothing in his hands that raised Stauffer's suspicion. Sergeant Stauffer followed the truck through town and to a residence on Main Street.

Law enforcement never recovered the marked bills used by A.C. to purchase the methamphetamine or hydrocodone. Law enforcement obtained a search warrant for Gregg Loughbom's home. We do not know the location of the home. Law enforcement officers found no controlled substances inside the home. Officers also failed to locate

7

Loughbom.

The State of Washington charged Gregg Loughbom with three crimes: delivery of controlled substances, acetaminophen and hydrocodone, on December 31, 2016; delivery of a controlled substance, methamphetamine, on December 20, 2016; and conspiracy to deliver a controlled substance between December 20, 2016 and January 1, 2017. The prosecution proceeded to trial.

Gregg Loughbom's jury pool, during voir dire, nearly unanimously expressed belief in a drug problem infecting Lincoln County, the trial's venue. At the beginning of voir dire by the State's counsel, the following exchange occurred:

> [PROSECUTING ATTORNEY]: Now, kind of getting into a little bit about the nature of this case, this, as mentioned, Judge Strohmaier stated this involves two counts of [d]elivery of a [c]ontrolled [s]ubstance and one count of [c]onspiracy to [d]eliver a [c]ontrolled [s]ubstance. Are there any among you who believe that we have a drug problem in Lincoln County? Wow, okay. Just about everything [everyone].
> Is there anyone who feels that we don't? Just so I can eliminate the—
> THE JUROR [25]: It's not that I don't. It's—I'm just very new to the area and I don't know.
> [PROSECUTING ATTORNEY]: Okay. Okay. That's fine. Anyone else who thinks we don't have a problem in the area or—or don't have one? Okay.
> So nearly—pretty much everyone except No. 25.

RP at 52-53.

After reintroducing himself during opening statement, the prosecutor immediately characterized the case:

> The case before you today represents yet another battle in the
> ongoing war on drugs throughout our state and throughout our nation as a
> whole.

RP at 87.  During the trial testimony of Detective Roland Singer, the following exchange

occurred:

> Q. And how do you usually recruit confidential informants?
> A. Various ways.  It could be somebody from—we—we—I talk to
> people almost on a daily basis to try to find people that are willing to work
> for us.  It could be somebody that was pulled over and got a ticket for
> suspended driving that has the information that we're looking for to get into
> a house that that we've been trying to get into that they're able to get into.
> So sometimes we deal with confidential informants that are not
> under contract, they just come in because they want to change or help *fight
> the drug problem that we have in our county*, most of the time, though, it's
> somebody that has charges that is willing to help us with furthering our
> investigations.

RP at 103-04 (emphasis added).

> The prosecuting attorney opened his summation to the jury by intoning:

> The case before you represents yet another battle in the ongoing war
> on drugs throughout our state and throughout the nation as a whole.

RP at 87.  In his rebuttal summation, the State's attorney argued:

> I had mentioned before that law enforcement cannot simply pick and
> choose their CIs to be the golden children of our society to go through and
> try and complete these transactions as they go forward in the, like I said, *the
> ongoing war on drugs in this community* and across the nation.

RP at 168 (emphasis added).

> On appeal, Gregg Loughbom claims prosecutorial misconduct prevented his

receiving a fair trial.  To resolve a claim of prosecutorial misconduct, we first inquire

whether the prosecutor made improper comments, then, if such comments were made, we inquire as to whether they were prejudicial to the defendant. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). Actually, a showing of prejudice may not even suffice for a new trial.

In Gregg Loughbom's appeal, the answer to the first question as to whether the prosecuting attorney committed misconduct by invoking the political mantra "war on drugs" comes easy. On three occasions, this court has instructed prosecutors not to employ the catchphrase "war on drugs" or suggest to the jury a nationwide, statewide, or countywide fight to combat drugs. Twice the directive arose from dicta. *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006); *State v. Neidigh*, 78 Wn. App. 71, 79, 895 P.2d 423 (1995). In the third case, this court reversed a conviction because of use of the inflammatory idiom "war on drugs." *State v. Echevarria*, 71 Wn. App. 595, 860 P.2d 420 (1993). Even without such rulings by this court, a prosecuting attorney should know that the use of the political cliché serves no purpose other than to impose an unfair burden and extraneous weight on the accused to overcome the political perception that drugs have ruined American society. I will return to the Washington decisions later. First some general principles.

The law forbids the government's injection of improper or prejudicial material that deprives an accused of his or her right to a fair trial. *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). Therefore, a prosecutor's opening statement

10

should be confined to a brief statement of the issues of the case, an outline of the

anticipated material evidence, and reasonable inferences to be drawn therefrom. *State v.*

*Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984). Argument and inflammatory

remarks have no place in the opening statement. *State v. Kroll*, 87 Wn.2d 829, 835, 558

P.2d 173 (1976). The same rules and policies apply to the closing statement. Appeals to

the jury's passion and prejudice are improper. *State v. Claflin*, 38 Wn. App. 847, 850,

690 P.2d 1186 (1984). The prosecutor's duty includes seeking a verdict free of prejudice

and based on reason. *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968). The

prosecutor's duty to act impartially derives from his or her position as a quasi-judicial

officer. *State v. Kroll*, 87 Wn.2d at 835; *State v. Echevarria*, 71 Wn. App. at 598 (1993).

The American Bar Association has addressed the duty of prosecutors to refrain

from politically and culturally charged comments. American Bar Association standards

include:

> (c) The prosecutor should not make arguments calculated to appeal
> to improper prejudices of the trier of fact. The prosecutor should make
> only those arguments that are consistent with the trier's duty to decide the
> case on the evidence, and should not seek to divert the trier from that duty.

ABA Standards for Criminal Justice § 3-6.8(c) (4th ed. 2015).

Based on these principles of prosecutorial conduct, the prevailing view is that

references to a war on drugs during a controlled substances prosecution are improper.

*United States v. Boyd*, 131 F.3d at 955 (11th Cir. 1997); *United States v. Solivan*, 937

11

F.2d 1146, 1153 (6th Cir. 1991); *Wise v. State*, 132 Md. App. 127, 751 A.2d 24, 30 (2000); *State v. Echevarria*, 71 Wn. App. at 598 (1993); *State v. Draughn*, 76 Ohio App. 3d 664, 602 N.E.2d 790, 795 (1992). Inflammatory language of this ilk falls well outside the bounds of permissible argument. *Arrieta-Agressot v. United States*, 3 F.3d 525, 527 (1st Cir. 1993). Informing jurors during opening statements that they are participating in the war on drugs serves no legitimate purpose. *Billings v. State*, 251 Ga. App. 432, 433, 558 S.E.2d 10 (2001). References to a war on drugs serves no purpose other than to inflame the passions and prejudices of the jury and to interject issues broader than the guilt or innocence of the accused. *Arrieta-Agressot v. United States*, 3 F.3d at 527; *United States v. Beasley*, 2 F.3d 1551, 1560 (11th Cir. 1993). The bromide constitutes a thinly-veiled attempt to inflame the jurors by identifying the defendant with matters of public notoriety as to which no evidence was or could have been ever introduced. *State v. Holmes*, 255 N.J. Super. 248, 604 A.2d 987, 989 (App. Div. 1992). The platitude suggests that if the jury fails to convict the accused, the drug problem in the jurors' community will continue unabated. *United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992).

A frequently quoted passage about the impropriety of invoking the war on drugs comes from the Sixth Circuit of the United States Circuit Court of Appeals:

> Here, defendant's constitutional right to a fair trial was violated because the appeal to the community conscience in the context of the War on Drugs prejudicially impacted on her. The fear surrounding the War on

Drugs undoubtedly influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision finding defendant guilty or innocent of the crimes with which she was charged. The substance of the statements made by the prosecutor in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regarding the War on Drugs by urging them to send a message and strike a blow to the drug problem.

This nation faces a variety of social problems with which all citizens are daily confronted. The drug problem is one of the most compelling and devastating problems faced by this nation today. This Court is acutely aware of the nature and extent of the drug problem. However, government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities, or to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful to the constitutional right to a fair trial. It should be clear from the foregoing discussion that, while not causing error per se unless the statements are deemed to be calculated to incite prejudice, prosecutors should exercise extreme caution when making any statement referring to the community interests of jurors.

*United States v. Solivan*, 937 F.2d at 1153-54 (6th Cir. 1991).

Washington probably follows a rule that mentioning the war on drugs always constitutes prosecutorial misconduct. This court wrote, in dicta, in *State v. Neidigh*, 78 Wn. App. 71 (1995):

vengeance, exhortations to join the *war against crime or drugs*, comparisons to notorious criminals, name-calling, appeals to prejudice, patriotism, wealth, or class bias, comments on the defendant's failure to testify or exercise of another constitutional right, improper remarks about defense counsel, and hints of violence, crimes, or important inculpating information that has been kept out of evidence. *See* B. Gershman, *Prosecutorial Misconduct,* ch. 10, "Forensic Misconduct" (1994).

*State v. Neidigh*, 78 Wn. App. at 79 (emphasis added). This court, also in dicta, declared in *State v. Perez-Mejia*, 134 Wn. App. 907 (2006):

13

>     Likewise, inflammatory remarks, incitements to vengeance,
> exhortations to join a *war against crime or drugs*, or appeals to prejudice or
> patriotism are forbidden.

*State v. Perez-Mejia*, 134 Wn. App. at 916.

In *State v. Echevarria*, 71 Wn. App. 595 (1993), this court reversed William Echevarria's conviction for delivery of cocaine. At trial, the prosecutor began his opening statement by referring to the "'war on drugs.'" 71 Wn. App. at 596. He remarked that the jurors knew from the news the identities of the "'commanders'" and "'generals'" of the war on drugs. 71 Wn. App. at 596. He stated that the trial would not be about these leaders, but rather about the "'enlisted men or the recruits'" who become involved in drugs "'for the power or the money or the greed or peer pressure.'" 71 Wn. App. at 596. The defense promptly objected to the initial remarks but was overruled. The prosecutor then referred to the "battlefield of our own streets, our own neighborhoods and our own schools." 71 Wn. App. at 597.

On appeal, in *State v. Echevarria*, the State argued that, although William Echevarria objected to the initial references to the war on drugs, he did not preserve his claim of prosecutorial misconduct because he did not object to later comments. The court disagreed and characterized the comments as so flagrant and ill-intentioned that no curative instruction could have erased their prejudicial effect. The court observed that inflammatory language of this ilk falls well outside the bounds of permissible argument. The prosecutor's improper references to the war on drugs set the tone for the entire trial.

14

Finally, the court concluded that the departure from the prosecutor's proper role as a quasi-judicial officer likely affected the verdict. After *Echevarria*, every Washington State prosecuting attorney should know never to mention a war on drugs.

I must now determine whether Gregg Loughbom should receive a new trial because of the prosecutorial misconduct. Under traditional Washington principles, the grade of the prosecutorial misconduct and the extent of the prejudice influence whether to reverse a conviction. I would reverse the conviction for many reasons. The grade of prosecutorial misconduct is high because every prosecuting attorney should know not to utter the political slogan of a war on drugs. Court decisions note the extreme prejudice resulting from an incantation of the war. The inflammatory cliché established the theme and the tone of Gregg Loughbom's trial. The evidence against Loughbom was not overpowering. Finally, curative instructions do not cure an unfair trial.

Gregg Loughbom's trial counsel failed to object to the provoking comments about the war on drugs. Different rules reign concerning the nature of the misconduct the appellant must show to gain a new trial depending on whether defense counsel objected at trial.

The law encourages a party to raise objections at trial rather than for the first time on appeal. Despite this policy, one might argue that a defendant should be entitled to one free trial, even without an objection, when the prosecuting attorney utters inflammatory words. The prosecutor should know the law and should not mention the war on drugs,

15

and the defendant should not undergo the embarrassment of objecting before a jury to correct the prosecutor's mistake. Vindication of an accused's rights should not depend on the skills of his or her lawyer and whether his or her lawyer timely objected to errors by the prosecuting attorney. According to one Washington Supreme Court decision, the failure to object should and will not prevent a reviewing court from protecting a defendant's constitutional right to a fair trial. *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015). The State, by its misconduct, bears the blame for any retrial despite the lack of an objection. Unless the courts impose a prophylactic rule that reverses a conviction upon prosecutorial misconduct, a prosecuting attorney could knowingly continue to misstate the law with the expectation that a reviewing court will find no prejudice and affirm a verdict of guilt.

Despite these considerations, the law places a burden of objection on the criminal defendant with few exceptions. Counsel may not remain silent, speculating on a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal. *State v. Russell*, 125 Wn.2d 24, 93, 882 P.2d 747 (1994); *State v. Reed*, 168 Wn. App. 553, 577-78, 278 P.3d 203 (2012). Proper and timely objections provide the trial court an opportunity to correct the prosecutorial misconduct and caution jurors to disregard it. *State v. Walker*, 182 Wn.2d at 477. Timely objections prevent abuse of the appellate process and save the substantial time

16

and expense of a new trial. *State v. Emery*, 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012).

To prevail on appeal on a claim of prosecutorial misconduct when the defense objected below, a defendant must show first that the prosecutor's comments were improper and second that the comments were prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008); *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007); *State v. Russell*, 125 Wn.2d at 85. If defense counsel fails to object to the misconduct at trial, the defendant on appeal must show more than a misstatement of the law and some prejudice. Washington courts consider the claim of prosecutorial misconduct waived on appeal unless the misconduct is so flagrant and ill-intentioned that it evinces an enduring prejudice the trial court could not have cured by an instruction. *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006), *overruled on other grounds by*, *Sate v. W. R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Evans*, 163 Wn. App. 635, 642-43, 260 P.3d 934 (2011).

Because of Gregg Loughbom's attorney's failure to object to the prosecutor's intonation of the drug war, the prevailing rule tasks this court with determining whether the prosecuting attorney's misconduct was flagrant and ill-intentioned and whether Loughbom suffered enduring prejudice. Because of these vague concepts and other bewildering standards, this task may be impossible. "Ill-intention" means having malicious intentions. Dictionary.com, http://www.dictionary.com/browse/ill-intentioned

17

(last visited May 20, 2019). A prosecutor will likely never concede to malevolent intent. Thus, a reviewing court enters a quagmire when attempting to discern the intentions of a prosecuting attorney. The misconduct of the prosecutor must also be flagrant. "Flagrant" is something considered "wrong or immoral[,] conspicuously or obviously offensive." Oxford English Dictionary Online, https://en.oxforddictionaries.com/definition/flagrant (last visited May 20, 2019).

Characterizing a prosecuting attorney's conduct as ill-intentioned and flagrant also is problematic. Reviewing courts wish not to impugn any attorney with a ruling that the attorney engaged in flagrant, malicious behavior. This reluctance particularly extends to a prosecuting attorney who is a representative of the State of Washington and either an elected official or the deputy of an elected official. Assessing whether prosecutorial misconduct is flagrant and ill-intentioned imposes an embarrassing and difficult duty on a reviewing court. For this and other reasons, courts shy from assessing prosecutorial misconduct as flagrant.

Despite the ill-intentioned standard, our Supreme Court directed us not to delve into the mind of the prosecutor. The Supreme Court has written twice that we should not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection. *State v. Walker*, 182 Wn.2d at 478 (2015); *State v. Emery*, 174 Wn.2d

at 762 (2012). This principle conflicts with the common understanding of ill-intention being subjective in nature. Intentions are always subjective.

The law affords a reviewing court few guidelines and standards for determining either the subjective or objective intentions of the prosecuting attorney. Nevertheless, at least two Washington courts have noted one factor to consider when determining if improper prosecutorial arguments were flagrant and ill-intentioned. An argument should be so characterized when a Washington court previously recognized those same arguments as improper in a published opinion. *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010); *State v. Fleming*, 83 Wn. App. 209, 213-14, 921 P.2d 1076 (1996). In *State v. Fleming*, the prosecuting attorney told the jury that, to acquit the defendants of rape, the jury must find that the victim lied or was confused. This court held the misconduct to be flagrant because the prosecutor uttered the argument two years after an opinion proscribing the argument.

We do not know the intentions of Gregg Loughbom's trial prosecuting attorney. Nevertheless, if this court follows *Johnson* and *Fleming*, this court must hold Loughbom's prosecutor to have engaged in flagrant and ill-intentioned conduct. Three published decisions before the date of trial declared that the prosecuting attorney must not reference a war on drugs. For this reason alone, I would grant Loughbom a new trial.

Remember that, in the end, the defendant must show the prosecutorial misconduct resulted in enduring prejudice, if counsel raised no objection. The rule of prosecutorial

19

misconduct is often phrased as requiring the defendant to demonstrate that the prosecutor's remark was so flagrant and ill-intentioned that no curative instruction would have been capable of neutralizing the resulting prejudice. *State v. Gregory*, 158 Wn.2d at 841 (2006); *State v. Evans*, 163 Wn. App. at 642-43 (2011). From this rule, one may deduce that the prosecutor's conduct is flagrant and ill-intentioned if and only if no curative instruction could correct the resulting prejudice. If so, the adjectives "flagrant" and "ill-intentioned" become redundant. We could streamline the rule by simply stating the defendant gains a new trial if and only if he establishes that no instruction could cure the prejudice of the prosecutor's misstatement. But this streamlined presentment of the rule begs a critical question in resolving appeals based on alleged prosecutorial misconduct: how do appellate judges, who did not observe the entire trial and who know nothing about the twelve jurors' thoughts and deliberations, determine whether a curative instruction would have prevented the jury from being influenced by the prosecutor's misstatement?

I question the ability of a reviewing court to adjudge the efficacy of a curative instruction. A jury consists of twelve representatives of the community, with each juror being influenced differently by evidence and argument. Appellate judges' pampered existence in an ivory tower disqualifies them from being representatives of the community. As one earlier Washington court observed:

> It is highly improper for courts, trial or appellate, to speculate upon

20

> what evidence appealed to a jury. Jurors and courts are made up of human
> beings, whose condition of mind cannot be ascertained by other human
> beings. Therefore, it is impossible for courts to contemplate the
> probabilities any evidence may have upon the minds of the jurors.

*State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946). If the parties wanted judges to sit in the seat of jurors and recreate the thoughts of jurors, the parties would have waived a jury trial.

The rule that the defendant must show that a curative instruction could not prevent prejudice assumes that a curative instruction helps. The rule is based on the presumption that the jury follows the court's instruction. *State v. Smith*, 144 Wn.2d 665, 679, 30 P.3d 1245, 39 P.3d 294 (2001). Many jurists question the efficacy of a curative instruction under any circumstances. United States Supreme Court Justice Robert Jackson wrote: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S. Ct. 716, 93 L. Ed. 790 (1949) (Jackson, J. concurring); quoted in *State v. Arredondo*, 188 Wn.2d 244, 280, 394 P.3d 348 (2017) (Gonzalez, J. dissenting); *State v. Craig*, 82 Wn.2d 777, 789, 514 P.2d 151 (1973) (Stafford, J. dissenting); *State v. Newton*, 109 Wn.2d 69, 74 n.2, 743 P.2d 254 (1987).

Since I do not deem judges, including myself, capable of determining whether a curative instruction would have stemmed prejudice emanating from the cry of war on drugs, I do not consider such a test a workable method of resolving an appeal. I would

grant Gregg Loughbom a new trial because Loughbom's right to a fair trial is at stake and because an instruction, as observed by United States Supreme Court Justice Robert Jackson and Washington courts, would help little. In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) and *State v. Draughn*, 76 Ohio App. 3d 664 (1992), the courts ruled that curative instructions did not and could not lessen the prejudice resulting from the prosecuting attorney's allusion to the war on drugs.

Washington courts also employ another test for a new trial that may or may not be consistent with the curative instruction standard. In analyzing prejudice resulting from prosecutorial misconduct, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Warren*, 165 Wn.2d at 28 (2008); *State v. Yates*, 161 Wn.2d at 774. When applying this standard, the court usually measures the strength of the State's evidence of guilt. *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015).

I will analyze the strength of the State's case against Gregg Loughbom later. On a side note, our Supreme Court, in its recent decision of *State v. Walker*, 182 Wn.2d 463 (2015), rejected weighing the State's evidence when assessing prejudice in the context of prosecutorial misconduct. *Walker* did not entail a prosecutor's mention of a war on drugs. Instead, during closing the prosecutor employed a PowerPoint presentation that included 250 slides, 100 of which were captioned with the words "DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER." One slide showed Walker's

22

booking photograph altered with the words "GUILTY BEYOND A REASONABLE DOUBT," which words were superimposed over the defendant's face in bold red letters. *State v. Walker*, 182 Wn.2d at 468, 471 (boldface omitted). Other photographs juxtaposed the defendant with the victim and included inflammatory captions. Inert trial defense counsel remarkably never objected to the PowerPoint slides. The Supreme Court reversed the conviction and held that the prejudicial effect could not have been cured by a timely objection.

In *State v. Walker*, the Supreme Court directed an analysis that ignores the State's evidence. The court held that an analysis of "prejudicial impact" does not rely on a review of sufficiency of the evidence. 182 Wn.2d at 479. The Court of Appeals had affirmed Walker's conviction because of overwhelming evidence of guilt. The high court wrote that, even if the State has strong evidence to affirm the convictions had the defendant challenged the sufficiency of the evidence, the focus must be on the misconduct and its impact, not on the evidence that was properly admitted. The voluminous number of slides depicting statements of the prosecutor's belief as to defendant's guilt, shown to the jury just before it was excused for deliberations, was presumptively prejudicial and difficult to overcome, even with an instruction. The ruling in *Walker* may be limited to its extraordinary facts. Otherwise *Walker* may have silently overruled numerous Washington decisions that weigh the vigor of the State's evidence when assessing prejudice.

23

I now mention other jurisdictions' handling of the issue of a prosecutor's summoning the war on drugs so that I might extract additional factors to consider in resolving Gregg Loughbom's request for a new trial. In Texas, the prosecuting attorney remains free to tell the jury to do its part in the war against crime, including the war on drugs. *King v. State*, 4 S.W.3d 463, 464-65 (Tex. App. 1999). Illinois courts also permit a reference to the war on drugs. *People v. Reid*, 272 Ill. App. 3d 301, 649 N.E.2d 593, 208 Ill. Dec. 537 (1995); *People v. Peterson*, 248 Ill. App. 3d 28, 618 N.E.2d 388, 187 Ill. Dec. 797 (1993); *People v. Loferski*, 235 Ill. App. 3d 675, 601 N.E.2d 1135, 176 Ill. Dec. 437 (1992). One commentator noted that Illinois and Texas were leading examples of States whose courts permit the virtually unlimited use of such rhetoric without articulating a rationale beyond the bald statement that the rhetoric has always been accepted. Charles G. Curtis, Jr., Comment, *Prosecutors' Deterrence Appeals in State Criminal Trials*, 48 U. CHI. L. REV. 681, 691 (1981).

Missouri deems reference to the war on drugs as not a per se violation of a defendant's rights. *State v. Gola*, 870 S.W.2d 861, 865 (Mo. Ct. App. 1993); *State v. Lumpkin*, 850 S.W.2d 388, 395 (Mo. Ct. App. 1993); *State v. Smith*, 849 S.W.2d 677, 681 (Mo. Ct. App. 1993); *State v. Hatcher*, 835 S.W.2d 340, 346 (Mo. Ct. App. 1992); *State v. Williams*, 747 S.W.2d 635, 638 (Mo. Ct. App.1988). In *State v. Walker*, 181 Ariz. 475, 891 P.2d 942, 950 (Ct. App. 1995), the Arizona court ruled that reference to the war on drugs did not constitute misconduct because the prosecutor did not explicitly enlist the

24

jurors to join in the battle. In a number of cases, foreign courts recognized the improper nature of the reference to the war on drugs but denied reversal because of overwhelming evidence of guilt. *United States v. Boyd*, 131 F.3d 951 (11th Cir. 1997); *United States v. Barlin*, 686 F.2d 81 (2d Cir. 1982); *People v. Graves*, 194 A.D.2d 925, 598 N.Y.S.2d 855 (1993); *United States v. Hawkins*, 193 U.S. App. D.C. 366, 595 F.2d 751 (1978). In still other cases, the courts noted the lack of an objection at trial and then summarily ruled that the defendant failed to show substantial prejudice. *United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993); *Billings v. State*, 251 Ga. App. 432 (2001); *State v. Thompson*, 259 Mont. 62, 853 P.2d 1188 (1993); *Killings v. State*, 583 So. 2d 732, 733 (Fla. Dist. Ct. App. 1991).

In *Billings v. State*, the Georgia court observed that the record provided ample evidence that Billings was guilty of possessing cocaine, including evidence that two law enforcement officers saw him with the cigarette pack that contained the cocaine and testimony that Billings acknowledged holding the cigarette pack. In *State v. Williams*, 03-942 (La. App. 5 Cir. 1/27/04) 866 So. 2d 1003, 1013, the reviewing court noted that the comment was improper, but refused to reverse the conviction because the prosecuting attorney mentioned the war only once in opening statement, the trial court instructed the jury that the opening statement was not evidence, and the State presented overwhelming evidence of guilt. In *Killings v. State*, a concurring judge agreed that strong evidence supported the guilty verdict but wrote that the inappropriate and intemperate

25

prosecutorial comments invoking the drug war stretched the harmless error rule almost to the snapping point and fueled the flame of those who advocated the adoption of a per se rule of reversal for such misconduct. *Killings v. State*, 583 So. 2d at 733 (Miner, J. concurring).

In *Schnitz v. State*, 650 N.E.2d 717 (Ind. Ct. App. 1995), *aff'd*, 666 N.E.2d 919 (Ind. 1996), the prosecuting attorney intoned during summation:

> *There's a war on drugs in this country.* A lot of people involved in it. *The only way you stop it is to prosecute the people you have cases on.*
> . . . .
> Ladies and Gentlemen, I think if you go back into that jury room and vote guilty on this case, *you'll send a message to all the other dope dealers in this community* that you're not going to tolerate people that get involved in transactions for their own benefit.

650 N.E.2d at 723. The State argued that Kenneth Schnitz failed to preserve his assignment of prosecutorial misconduct because he did not register an objection at trial. The court addressed the merits anyway and affirmed the conviction. The court remarkably ruled that the prosecuting attorney committed no misconduct because he never urged the jury to convict Schnitz for improper or irrelevant reasons.

In many cases, in addition to this court's decision in *State v. Echevarria*, 71 Wn. App. 595 (1993), courts have reversed convictions because of the prosecutor's mention of a war on drugs. In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), the reviewing court reversed Rosalba Solivan's conviction for cocaine sales. The prosecutor limited his reference to the war on drugs to only closing argument. The government counsel asked

26

the jury to tell the defendant and other drug dealers to keep drugs from northern Kentucky. Still, according to the court, the limited reference did not ameliorate its prejudicial impact. The trial court admonished the jury about the improper nature of the comments, but after a twenty-five-minute request. According to the appellate court, the comments required an immediate stern rebuke and repressive measures. Even if the district court had immediately instructed the jury and scolded the prosecutor, the reviewing court doubted the possibility of eradicating the prejudice. The prosecuting attorney had injected reference to the war on drugs to influence the jurors' emotions and fears associated with the drug epidemic reported daily in American newspapers.

The reader of *United States v. Solivan* is not certain who held the burden of proof on the effect of the prosecutorial misconduct and what standard of review the court applied. The Sixth Circuit Court of Appeals variously stated that it could not say that the government demonstrated, beyond a reasonable doubt, that the prejudicial comments did not contribute to the defendant's conviction. The court spent no time assessing the evidence of guilt.

In *Arrieta-Agressot v. United States*, 3 F.3d 525 (1st Cir. 1993), the federal circuit court reversed the conviction of six workers aboard an intercepted Caribbean ship carrying bales of marijuana. The ship's captain testified that the workers had no knowledge of the cargo and were hired at the last minute to assist in the passage from Colombia. The prosecutor told the jury that everyone knows drugs to be a problem. In

27

addition to mentioning the war on drugs, the prosecuting attorney referred to the defendants as enemies in the army of evil.

The First Circuit Court of Appeals court, in *Arrieta-Agressot v. United States*, noted that defense trial counsel failed to object to the prosecuting attorney's comments. The court further commented that reviewing courts are reluctant to reverse convictions when counsel failed to raise an objection in trial, and the court repeated the worry about encouraging strategic decisions by trial counsel to remain mute in the face of error and thus reserve the issue for an appeal in the event of a conviction. In that federal circuit, the court would not reverse unless the mistake rose to "plain error." 3 F.3d at 528. The court refused to take the evidence in the light most favorable to the prosecution because the jury decision could be tainted by the improper remarks. The court stated it would reverse the conviction if "there is a substantial chance that absent the error the jury would have acquitted." 3 F.3d at 528. The court reversed because there was "evidence that made acquittal a realistic possibility." 3 F.3d at 528. The question, at least on direct appeal, was whether the prosecutor's repeated appeals to impermissible considerations might well have altered the verdict, thereby affecting appellants' substantial rights. The jury may have been swayed by the prosecutor's impermissible rhetoric. The government emphasized that the trial court delivered the jury instruction informing the jury that remarks of counsel were not evidence. Nevertheless, the danger was not that the jury would consider the prosecutor's statements to be evidence. Rather, the threat was that the

28

prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented by this case: whether the evidence established the crew members' guilt beyond a reasonable doubt.

In *State v. Draughn*, 602 N.E.2d 790 (1992), the court recognized an incongruity of justifying an affirmance of a conviction, despite prosecutorial misconduct, on the ground that the evidence of guilt was overwhelming. Thus, the stronger the state's case, the more leeway courts give to the prosecutor to overstep. But yet, if the argument is harmless because the evidence of guilt is overwhelming, why must the prosecutor overstep in final argument? For this reason, the court decided to judge the consequences of misconduct without regard to the merits of the evidence. After all, the quality and quantity of the evidence is otherwise subject to an independent assignment of error and judicial review.

In *State v. Draughn*, the prosecuting attorney referenced in closing rebuttal the crack cocaine problem in a rural Ohio county. He claimed pride in representing the county's drug unit. He intoned: "ladies and gentlemen of the jury, we are at war with the likes of Alvin Draughn." 602 N.E.2d at 795. The trial court sustained objections to the prosecuting attorney's remarks and directed the jury to disregard comments. The appeals court reversed Draughn's drug convictions. In addition to writing that prosecutorial misconduct should be evaluated outside the weight of the evidence, the court observed

that the close case hinged on the testimony of an informant admittedly out for revenge against Draughn.

In *State v. Holmes*, 255 N.J. Super. 248 (App. Div. 1992), the State convicted Ruben Holmes of possessing cocaine. Law enforcement arrested Holmes in the lobby of a Newark apartment building in the course of a police raid. According to the State's testimony, Holmes had dropped a cellophane bag containing three vials of cocaine and a $50 bill onto the floor as the police entered. Police seized both items. The defense challenged the credibility of the law enforcement officers. Holmes and a supporting witness maintained that, on entering the building, five overzealous armed police officers immediately searched them, but found no contraband on their persons. Later officers found the cellophane bag in a fireplace within the lobby.

The New Jersey district attorney, in *State v. Holmes*, on opening, declared: "You all understand the particular drug problem that we have in this country, particularly Newark and I submit to you, that the police officers don't have to make up facts." 604 A.2d at 988 (emphasis omitted). When defense counsel objected, the trial court said: "'All right. I think just stay within the facts. You have your summations, Mr. [Prosecutor].'" 604 A.2d at 988. The prosecutor returned to the theme in closing by uttering: "[w]*ith the war on drugs*, he [the police witness] didn't have to come before you and fabricate these type [sic] of cases." 604 A.2d at 988 (some emphasis added) (alteration in original).

30

On appeal, in *State v. Holmes*, the reviewing court rejected the State's contention that the impugned portions of its opening and closing statements were calculated only to persuade the jury that the police witnesses were believable because they had no reason to lie. The court answered that the war on drugs is irrelevant to the police witnesses' credibility. Instead, the prosecutor's references were a thinly-veiled attempt to inflame the jurors by identifying Holmes with matters of public notoriety. Although the defendant objected to the prosecutor's opening statement, the objection was not sustained and no curative instruction was given to the jury. No objection was made when the prosecutor invoked the war on drugs on summation, but the statement constituted plain error. The prosecutor's statements to the jurors were nothing less than a call to arms which could only have been intended to promote a sense of partisanship incompatible with their duties. It was the jury's function, not to enlist in the war on drugs, but to listen to the evidence and decide in a dispassionate way the question of Holmes' guilt. References to the war on drugs divert the jurors' attention from the facts of the case before them.

In *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992), the United States prosecuted Ronald Johnson for distribution of methamphetamine and conspiracy to distribute the drug. In summation, the government's attorney declared:

> [The defense attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the

31

> continuation of what Mr. Johnson is doing on the street, putting this poison
> on the street.

968 F.2d at 768 (alteration in original). The Court of Appeals noted that someone else delivered the drugs to the informant outside Johnson's house. The jury could infer that the handler received the drugs from Johnson. In the absence of the improper remarks by the prosecutor, the court would find sufficient evidence to sustain Johnson's conviction. Nevertheless, given the fear and concern engendered by the national drug epidemic, the court concluded that the prosecutor's comment urging the jury to strike a blow against the problem and the emotion it stirred influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision. Under the circuit's rule of review, when the prosecutor's remarks were improper and the evidence marginal, the conviction would be reversed.

In *Commonwealth v. Lindsey*, 48 Mass. App. Ct. 641, 724 N.E.2d 327 (2000), the Commonwealth of Massachusetts charged Darren Lindsey with trafficking in cocaine. The jury acquitted him of two charges and convicted him on one. According to the Court of Appeals, the prosecutor corrupted the atmosphere of the trial by referring repeatedly to the subculture of drug dealers inhabited by Lindsey. Then the prosecuting attorney delivered a bizarre burst:

> Unless we buy the countries of Colombia and Bolivia and other
> Central American countries and burn them to the ground, drugs are going to
> keep coming into this country. And as long as they remain illegal, police
> officers will risk their lives to fight the war on drugs.

724 N.E.2d at 331.

On appeal, in *Commonwealth v. Lindsey*, the Commonwealth asked the court to palliate the prosecutor's blunders. According to the Commonwealth, despite the fault of uttering overheated and misdirected appeals to convict, the jury must not have been influenced because the jury acquitted Johnson on two charges. Also, because trial counsel did not register objections, the Commonwealth requested the court to limit its standard of review to a substantial risk of a miscarriage of justice. The court still reversed. The court characterized the case as "not crystal clear," but did not assess the strength of the evidence. *Commonwealth v. Lindsey*, 724 N.E.2d at 331.

I note that most decisions addressing prosecutorial misconduct in the context of commenting on the war on drugs are decades old. I thus ponder if the lack of recent cases confirms that prosecuting attorneys know not to enlist the imagery of war.

I already stated that I would reverse Gregg Loughbom's conviction because three Washington decisions forbad Loughbom's prosecuting attorney from uttering the political message. I also stated I would reverse Gregg Loughbom's conviction because a curative instruction would not minimize the harm of the inflammatory reference. I would also reverse because of the lack of overwhelming evidence.

The jury acquitted Gregg Loughbom of the count of delivery of acetaminophen and hydrocodone on December 31. The State might then argue that the jury must not

33

have been influenced by the mention of the drug war. *Commonwealth v. Lindsey*, 724 N.E.2d 327 (2000), teaches otherwise. Gregg Loughbom's jury might not have thought the evidence strong on any charge but that the evidence, by a preponderance of evidence, showed guilt on the two other charges. As a way of compromising and assisting the war on drugs, the jury could have decided to convict on the two other charges.

Evidence permitted a conviction of Gregg Loughbom on the charges of delivery of methamphetamine and conspiracy to deliver methamphetamine. Some evidence comes from two officers who saw Loughbom's truck around the time and place of the delivery of methamphetamine, but neither officer saw the delivery or Loughbom. The stories of the officers and the informant A.C. differ with regard to the first purchase. The officers claim the transaction occurred in a residence. A.C. states the transaction occurred in a garage. The sheriff deputies state that A.C. entered a residence. A.C. averred that he never entered the home. The State gained no confession. The State gathered no fingerprints on the drug containers. The State found no buy money. The State searched Gregg Loughbom's residence and found no evidence of controlled substances.

The State's evidence relied extensively on an informant. In *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992) and *State v. Draughn*, 602 N.E.2d 790 (1992), the courts reversed convictions for the prosecutorial misconduct in cases in which the government relied on an informant. In *State v. Draughn*, the court emphasized that the informant admitted to desiring retaliation against Alvin Draughn. Thus, the informant

34

held motivation to bear false witness. A.C. wished no retaliation against Gregg Loughbom. Still, he had a strong motivation to help convict Loughbom. He wished to escape charges for his criminal conduct. The State might argue that it never promised A.C. special treatment. The lack of a promise could have motivated A.C. even more. The State stayed charges against him to determine if he would provide successful testimony against Loughbom.

The prosecuting attorney's comments in *State v. Echevarria* were more extreme than Gregg Loughbom's prosecutor's comments. The comments in other cases were also more extreme. Nevertheless, the prosecutor's comments in *United States v. Johnson*, *United States v. Solivan*, *State v. Draughn*, and *State v. Holmes*, were either milder, similar in intensity, or fewer in number. In each of the cases, the reviewing courts reversed convictions.

Gregg Loughbom's prosecuting attorney did not explicitly implore the jury to participate as soldiers in the war on drugs. Nevertheless, the prosecuting attorney had no purpose in mentioning the war on drugs thrice other than to influence the jury despite the war's lack of relevance. Numerous decisions consider any reference to the war on drugs to be inflammatory. Loughbom's prosecutor uttered the political catchphrase at the beginning of his short opening statement to set the trial's theme. The opening statement platitude followed the nearly unanimous jury pool's registering concern about illicit drugs in Lincoln County. In turn, the prosecution elicited testimony from one sheriff

35

deputy to the effect that some informants volunteer to assist in order to combat drugs, when A.C. assisted in order to gain dismissal of charges. The prosecuting attorney uttered the cliché at the beginning of his closing statement to return to the prosecution's motif. The prosecuting attorney's additional reference to the battle in his summation rebuttal brought the drug war home to Lincoln County. By attempting to influence the jury, the prosecuting attorney impliedly sought the jury's participation in Lincoln County's and the nation's drug war by convicting Gregg Loughbom.

The State contends that its attorney's drug war remarks made during opening statement and closing arguments were a means of establishing the context for the subject matter of the trial. This contention shows the State's blindness to the misconduct. The problem with the remarks is that the comments did provide the context for the trial. Nevertheless, the war on drugs provided no framework for the guilt or innocence of Gregg Loughbom. The fact that the State wanted to establish a context for the prosecution surrounding the warfare demonstrates that the State wanted the jury to assist in this ersatz war. The State's argument further reveals that it sought to prejudice Gregg Loughbom with political charged considerations irrelevant to his trial.

I Dissent:

_____
Fearing, J.

36

No. 35668-0-III
*State v. Loughbom* (Dissent)

Appendix

*State v. Holly*, No. 77121-3-I (Wash. Ct. App. Feb. 25, 2019) (unpublished),
http://www.courts.wa.gov/opinions/pdf/771213.pdf.

*State v. Morrill*, No. 50070-1-II (Wash. Ct. App. Feb. 13, 2019) (unpublished),
http://www.courts.wa.gov/opinions/pdf/D2%2050070-1-II%20Unpublished%20
    Opinion.pdf.

*State v. Racus*, 7 Wn. App. 2d 287, 433 P.3d 830 (2019)

*In re Personal Restraint of Ivie*, No. 49526-1-II (Wash. Ct. App. Jan. 23, 2019)
(unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049526-1-II%20
Unpublished%20Opinion.pdf.

*State v. Calo*, No. 49794-8-II (Wash. Ct. App. Dec. 27, 2018) (unpublished),
http://www.courts.wa.gov/opinions/pdf/D2%2049794-8-II%20Unpublished
%20Opinion.pdf, *review denied*, No. 96743-1 (Wash. Apr. 3, 2019).

*State v. Jackson*, No. 77022-5-I (Wash. Ct. App. Dec. 10, 2018) (unpubished),
http://www.courts.wa.gov/opinions/pdf/770225.pdf.

*State v. Bolanos*, No. 76755-1-I (Wash. Ct. App. Nov. 13, 2018) (unpublished),
http://www.courts.wa.gov/opinions/pdf/767551.PDF, *review denied*, No. 96770-9 (Wash.
Apr. 3, 2019).

*State v. Kleinsmith*, No. 76632-5-I (Wash. Ct. App. Nov. 13, 2018) (unpublished),
http://www.courts.wa.gov/opinions/pdf/766325.PDF, *review denied*, 192 Wn.2d 1028,
435 P.3d 282 (2019).

*State v. Whitaker*, 6 Wn. App. 2d 1, 429 P.3d 512 (2018), *petition for review filed*,
No. 96777-6 (Wash. Jan. 24, 2019)

*State v. Eagle*, No. 76859-0-I (Wash. Ct. App. Nov. 5, 2018) (unpublished),
http://www.courts.wa.gov/opinions/pdf/768590.PDF, *review denied*, 192 Wn.2d 1028,
435 P.3d 283 (2019).

No. 35668-0-III
*State v. Loughbom* (Dissent)


*State v. Baus*, No. 76962-6-I (Wash. Ct. App. Nov. 5, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/769626.pdf, *review denied*, 192 Wn.2d 1030, 435 P.3d 277 (2019).

*State v. Pool*, No. 35296-0-III (Wash. Ct. App. Oct. 30, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/352960_unp.pdf, *review denied*, 192 Wn.2d 1025, 435 P.3d 272 (2019).

*State v. Gomez-Monges*, No. 32919-4-III (Wash. Ct. App. Oct. 18, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/329194_unp.pdf, *review denied*, 192 Wn.2d 1026, 435 P.3d 267 (2019).

*State v. Hart*, No. 35381-8-III (Wash. Ct. App. Oct. 2, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/353818_unp.pdf, *review denied*, 192 Wn.2d 1024, 435 P.3d 276 (2019).

*State v. Johnson*, No. 49682-8-II (Wash. Ct. App. Sept. 25, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049682-8-II%20Unpublished %20Opinion.pdf.

*State v. Goheen-Rengo*, No. 76424-1-I (Wash. Ct. App. Sept. 24, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/764241.pdf, *review denied*, 192 Wn.2d 1014, 432 P.3d 778 (2019).

*State v. Monghate*, No. 75474-2-I (Wash. Ct. App. Sept. 10, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/754742.pdf, *review denied*, 192 Wn.2d 1013, 432 P.3d 786 (2019).

*State v. Head*, No. 76608-2-I (Wash. Ct. App. July 30, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/766082.pdf.

*State v. Fulmer*, No. 49024-2-II (Wash. Ct. App. July 17, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049024-2-II%20Unpublished %20Opinion.pdf.

*In re Det. of Urlacher*, 6 Wn. App. 2d 725, 427 P.3d 662 (2018), *review denied*, 192 Wn.2d 1024, 435 P.3d 276 (2019)

*State v. Jennings*, No. 33910-6-III (Wash. Ct. App. June 28, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/339106_unp.pdf, *review denied*, 191 Wn.2d 1024, 428 P.3d 1187 (2018)

*State v. Baker*, No. 48839-6-II (Wash. Ct. App. June 12, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048839-6-II%20Unpublished %20Opinion.pdf, *review denied*, 192 Wn.2d 1002, 430 P.3d 258 (2018)

*State v. Goodson*, No. 34800-8-III (Wash. Ct. App. June 12, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/348008_unp.pdf

*State v. Ceesay*, No. 76045-9-I (Wash. Ct. App. May 21, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/760459.PDF.

*State v. Jacobson*, No. 49887-1-II (Wash. Ct. App. May 15, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049887-1-II%20Unpublished%20 Opinion.pdf, *review denied*, 192 Wn.2d 1005, 430 P.3d 247 (2018)

*State v. Lima*, No. 49304-7-II (Wash. Ct. App. Apr. 3, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049304-7-II%20Unpublished%20 Opinion.pdf.

*State v. Pope*, No. 74408-9-I (Wash. Ct. App. Mar. 26, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/744089.PDF, *review denied*, 190 Wn.2d 1031, 421 P.3d 447 (2018).

*State v. Ross*, No. 48321-1-II (Wash. Ct. App. Mar. 20, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048321-1-II%20Unpublished%20 Opinion.pdf, *review denied*, 190 Wn.2d 1031, 421 P.3d 447 (2018).

*State v. Snyder*, No. 75717-2-I (Wash. Ct. App. Feb. 26, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/757172.pdf.

*State v. Brown*, No. 75627-3-I (Wash. Ct. App. Feb. 12, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/756273.pdf.

*State v. Wood*, No. 49425-6-II (Wash. Ct. App. Feb. 6, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049425-6-II%20Unpublished %20Opinion.pdf, *review denied,* 190 Wn.2d 1031, 421 P.3d 448 (2018).

*State v. Berhe*, No. 75277-4-I (Wash. Ct. App. Feb. 5, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/752774.pdf, *review granted*, 191 Wn.2d 1026, 429 P.3d 511 (2018).

*In re Personal Restraint of Sandoval*, 189 Wn.2d 811, 832, 408 P.3d 675 (2018).

*State v. Nowacki*, No. 49163-0-II (Wash. Ct. App. Jan. 9, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049163-0-II%20Unpublished %20Opinion.pdf.

*State v. Salas*, 1 Wn. App. 2d 931, 408 P.3d 383, *review denied*, 190 Wn.2d 1016, 415 P.3d 1200 (2018)